COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Felton and Senior Judge Willis


LASHON DIANE BROWN

                                                     MEMORANDUM OPINION[*]
v.        Record Nos. 1398-04-1, 1399-04-1, 1400-04-1,        PER CURIAM
                 1401-04-1 and 1402-04-1                 AUGUST 2, 2005

NORFOLK DIVISION OF SOCIAL SERVICES


                   FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                            Norman A. Thomas, Judge

          (B. Cullen Gibson, on brief), for appellant.

          (Bernard A. Pishko, City Attorney; Martha G. Rollins, Deputy City
          Attorney; Kelly B. St. Clair, Guardian *ad litem*, for the minor
          children, on brief), for appellee.[1]


        Lashon Diane Brown (Ms. Brown) appeals the trial court's decision terminating her parental

rights to each of her five minor children, V.C., T.J.B., S.B., Tff.B., and Tam.B.  Ms. Brown

contends (1) the evidence was insufficient to support the terminations under Code § 16.1-283(B)

and (C); and (2) the trial court abused its discretion in refusing to meet in chambers with

Brown's fourteen-year-old daughter, V.C., during the termination hearing.  Upon reviewing the

record and the briefs of the parties, we conclude that these appeals are without merit.  Accordingly,

we summarily affirm the decision of the trial court.  See Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We grant the motion of the guardian *ad litem* to join the brief of the appellee.

Background

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence proved that on July 2, 2001, the Norfolk Juvenile and Domestic Relations District Court (J&DR court) entered a Preliminary Child Protective Order regarding two of Ms. Brown's children, V.C. and T.J.B.  "[I]inadequate housing, inappropriate sexual interaction and inadequate supervision by the parents" formed the basis for issuance of that order.  The children were placed in foster care at that time.

On August 1, 2001, the J&DR court granted a petition filed by the Norfolk Division of Social Services (NDSS) for removal of all five of Ms. Brown's children, based upon allegations that her husband, Mr. Brown, "sexually abused at least two of the children" and that "all children are believed to be at risk."  The affidavit of the investigating social worker indicated "there is substantial evidence that has been gathered by this agency, which leads this agency to believe that abuse has taken place, by the parents," including a physical examination by a physician of one of the complainant children indicative of penetration by an adult, the children's corroboration of their disclosures of sexual abuse when interviewed separately, and an assessment by the therapist who counseled the children indicating that their disclosures were credible.  In addition, the affidavit indicated that a 1995 psychological report generated in New Jersey to assess Mr. Brown's parenting capacity indicated that he was "the product of severe emotional and physical abuse."  That report further indicated that "[h]is information is frequently contradictory and he portrays himself alternatively as both a violent and loving person.  This father seemingly does not have the personal resources needed to function adequately as a parent . . . ."  The social worker noted that Mr. Brown had an extensive criminal record,

including both misdemeanor and felony convictions, and that he was criminally charged and found guilty of child abuse of one of his older children, resulting in him serving jail time and the victim child being placed in foster care.

The J&DR court conducted evidentiary hearings over a series of dates from August 2001 through January 29, 2003. The J&DR court approved foster care plans for the children on July 25, 2002 with the goal of "return to parents." On that date, Mr. Brown absconded from the courtroom during the hearing, thereby avoiding service of warrants for his arrest.

On August 16, 2002, the J&DR court issued protective orders denying the Browns contact with the children based upon NDSS's affidavit indicating that there were allegations of sexual abuse by Mr. Brown with the knowledge or acquiescence of Ms. Brown and that there were criminal charges currently before the Norfolk Circuit Court. That affidavit alleged that Ms. Brown continued to be involved with Mr. Brown and that her contact with the children could put them at risk; that Mr. Brown was not in custody and a warrant for his arrest was on file; and that he was stalking the children with the possible assistance of Ms. Brown. The J&DR court heard the protective order matters on August 22, 2002 and October 31, 2002, and merged them with the underlying case. On December 18, 2002, the J&DR court denied Ms. Brown's motion to rehear the protective order to enable visitation with V.C.

On January 29, 2003, at a permanency planning hearing held upon petition filed by NDSS on January 8, 2003, the J&DR court made findings of abuse and neglect with respect to all five children. Permanency plans approved at that hearing set forth the permanent goal of adoption. Pursuant to its permanency planning orders, the J&DR court approved the plans on an interim basis for six months, at which time a second permanency hearing would be held to

- 3 -

achieve the permanent goal. Those orders prohibited contact with the children by Mr. Brown until further order of the court.[2]

On September 3, 2003, NDSS filed petitions in the J&DR court for new permanency plans with the goal of adoption for Ms. Brown's children. In the new permanency plans, NDSS recognized that although Ms. Brown "has participated in several activities[, including parenting classes and support groups] to support her children's return, but she continues to maintain that this agency or it representatives evoked lies from her children so they could be put up for adoption." NDSS noted that Ms. Brown "objects to seeing the therapist who is currently seeing her children." In addition, NDSS noted that some of the children presented a series of physical, emotional, and educational problems that required therapeutic intervention. The plans also indicated the belief that Ms. Brown remained in contact with Mr. Brown, who remained a fugitive. The plans requested the goal of adoption due to the following:

> [Ms. Brown] and [Mr. Brown] have not made any appreciable changes that point to increased knowledge of appropriate parenting, setting boundaries, and identifying significant risks to their children.
>
> Mr. Brown remains absent after a year of avoiding court action to resolve charges of sexual abuse, indecent liberties, and improper conduct with a child. Mr. Brown has an extensive history of involvement with CPS in both the State of New Jersey and the Commonwealth of Virginia relating to child abuse and neglect, which led to the subsequent adoption of three of his children.
>
> Ms. Brown passionately expresses her belief that her children did not say the things they have said and that Mr. Brown is innocent of any charges levied against him. If she is unable or unwilling to

---

[2] Ms. Brown appealed the January 29, 2003 permanency planning orders to the circuit court. After taking evidence on October 31, 2003 and hearing argument on December 23, 2003, the circuit court, by order entered January 27, 2004, upheld the findings of abuse and neglect and found that the removal order and preliminary protective order were appropriate. However, the circuit court did not approve the goal of adoption presented in the Foster Care Permanency Plans filed on January 8, 2003, ordered NDSS to submit new petitions and plans, and remanded the cases to the J&DR court for additional proceedings.

acknowledge the potential for danger to her children by her husband, she will be less likely to exercise due caution to protect them. Since custody of her children was awarded to the agency, Ms. Brown has repeatedly heard evidence depicting Mr. Brown as inappropriate in his interactions with some of his children. She is vigorous in her denial of his actions, as well as denial of the allegations made by the children of her own involvement in the offenses against them.

These issues might be resolved if Ms. Brown becomes serious in her attempts to educate herself and position herself for interventions. These interventions will help Ms. Brown to realize that her children were telling the truth and will help her move beyond the recognition of that truth to a more protective mode of keeping her children safe.

NDHS suspects that Mr. Brown is still in contact with Ms. Brown, by evidence presented by Ms. Brown. She stated with pride that Mr. Brown donated the new residence she moved into in January 2003, and as recently as July 2003, she has commented to the CASA worker that her husband is going to get her a lawyer. Ms. Brown continually maintains to this worker that she has not seen or been in contact with her husband for over a year.

On November 21, 2003, the J&DR court approved the permanency plans for adoption, and set a hearing for termination of Ms. Brown's residual parental rights.

On February 12, 2004, upon petitions filed by NDSS, and after conducting an evidentiary hearing, the J&DR court entered orders terminating the residual parental rights of Ms. Brown and Mr. Brown pursuant to Code § 16.1-283(B), and gave NDSS authority to place the children for adoption.

At the May 18-19, 2004 termination hearing in the circuit court on appeal from the J&DR court, various social workers and therapists, who had evaluated the children and assisted NDSS in planning for them, testified as expert witnesses in the areas of child welfare and child abuse/neglect. Their testimony detailed the children's reports of neglect and sexual abuse alleged to have occurred prior to their removal from the Browns' home in August 2001, and alleged to have been perpetrated by Mr. Brown, their siblings, and some other children,

sometimes in Ms. Brown's presence and with her knowledge. The testimony of the therapists and social workers established that each of the children sustained trauma prior to their removal from the Browns' home in August 2001 and that they presented various significant and severe developmental, emotional, physical, and educational difficulties.

Belinda Brewster, a licensed clinical social worker, who was providing therapy to four of the children as of the date of the termination hearing, opined that the safety and overall well-being of the children would be in jeopardy if they were returned to Ms. Brown. Brewster testified that NDSS informed her that Ms. Brown refused to attend therapy with her and the children. Dr. Viola Vaughan-Eden, a licensed clinical social worker at the Child Abuse Program at Children's Hospital of King's Daughters, received medical evidence indicating that V.C. had been sexually abused. Jean Tatum, a social worker for the Browns' children until May 2003, testified that at a meeting after the July 25, 2002 hearing where Mr. Brown absconded, Ms. Brown told her "she didn't need to protect her children because she had no reason to protect them. Mr. Brown would not do anything like that."

Phyllis Spriggs, the children's social worker beginning in June 2003, testified that when she met with Ms. Brown at that time, at her address at 146 West Seaview, Ms. Brown told her that Mr. Brown "did all the decorations" in her home. Yet, Ms. Brown consistently told Spriggs that she had no contact with Mr. Brown since he left the courtroom in July 2002. On May 11, 2004, about one week before the termination hearing, Ms. Brown told Spriggs that she was still living at the 146 West Seaview address. However, when Spriggs checked the accuracy of that information, she found that Ms. Brown had been evicted from that residence in January 2004. Spriggs testified that all five children displayed educational and emotional problems.

At the termination hearing, when asked why her children were removed from her home, Ms. Brown claimed that Tamirrah, one of Mr. Brown's daughters with Virginia Wiggs, "lied

from day one" "[a]bout the sexual abuse acts." Ms. Brown testified that the charges against her

and Mr. Brown with respect to that child were ultimately dismissed. Ms. Brown claimed she

completed anger management, psychological evaluations, a psychosexual evaluation, and

parenting classes and that she attended different types of counseling and therapy, as she was

ordered to do. She admitted she refused therapy offered by NDSS, but claimed she did so

because she was seeing another therapist. Ms. Brown acknowledged that T.J.B. was sexually

abused by one of Wiggs's and Mr. Brown's sons. Ms. Brown claimed that she and Mr. Brown

called social services about the sexual abuse of T.J.B. She continued to deny the allegations of

sexual abuse against her, and maintained that she would never let anyone, including Mr. Brown,

hurt her children. She claimed, "this is all a mistake, a mistake made. They are blaming my

husband and me. I'm not blaming Social Services. It was a mistake. It was really a mistake,

and I blame more Virginia Wiggs than I do Social Services." When asked whether she believed

her husband abused her children in any way, Ms. Brown responded, "No, I don't. I believe that

what it is a misunderstanding." She also claimed she did not believe that her children had said

they were abused "because they told me different." Ms. Brown testified as follows:

> The children told me different. They told me that their daddy didn't do anything. I asked them that question. I asked my children. I really did. I asked them in front of Dr. Wald when he had the parent – like they got all the kids up, and he's watching through the glass mirror thing and the kids are blurting out themselves. I didn't coach them or nothing like that. I didn't say nothing to encourage it. They just came out and started telling me everything of what happened to them in foster care where they got abused.
>
> They started saying that Tamirrah lied about their daddy raping them, and the kids said and they told me – I asked the doctor did he jot it down. He told me yeah. The kids said the foster mother was beating them. . . .

Ms. Brown claimed the trauma sustained by her children occurred after they were

removed from her home in August 2001, due to being questioned over and over and "it gets to

- 7 -

them and they just lie." Other than the abuse by one of Wiggs's sons to T.J.B., Ms. Brown denied any other source of trauma to her children before they were removed from her home in August 2001. She denied having any contact with Mr. Brown since he left the J&DR court on July 25, 2002. Ms. Brown admitted she had no appropriate housing for her children.

At the termination hearing, Ms. Brown's former landlord, Cathleen Stewart, testified that Mr. Brown entered into a six-month lease, dated October 30, 2003, to rent property from her located at 146 West Seaview. Mr. Brown signed the lease in Stewart's presence. Stewart indicated that she had seen and talked to both Mr. and Mrs. Brown at the property after July 25, 2002; that Mr. Brown lived there and made repairs; that around October 2003, Ms. Brown asked her to tell NDSS that Mr. Brown was not living at the property; and that the Browns were evicted in January 2004. Stewart stated that she saw Mr. Brown at the property about two weeks before the eviction, and she also believed Wiggs and her children were living at the property.

In response to Stewart's testimony, Ms. Brown claimed that she had a friend pose as her husband in dealing with Stewart. Ms. Brown also claimed that Stewart lied when she testified that she had contact with Mr. Brown in 2004.

Based upon this record, the circuit court granted the petition to terminate Ms. Brown's residual parental rights, reiterating its finding by clear and convincing evidence that all five children, while in the home and under Ms. Brown's care and custody, were neglected and abused within the statute and that such abuse and neglect was substantial and led to "deep-rooted and lasting traumatization of these children." The circuit court found it was not reasonably likely that the conditions, which led to the abuse and neglect, were substantially corrected or eliminated to allow the children's safe return to Ms. Brown within a reasonable time. The trial court recognized Ms. Brown's efforts at evaluations, assessments, therapy, and parenting education, but noted her continuing denial of the underlying trauma of her children, finding that she will not

- 8 -

or cannot protect them from future abuse and neglect. The trial court did not find Ms. Brown to be a credible witness, noting the conflicts between her testimony and Stewart's testimony regarding her contact with Mr. Brown in 2003 and 2004. The trial court concluded that Ms. Brown had not ceased her ongoing relationship with Mr. Brown, "who was at a minimum a substantial contributor to the children's trauma in their home situation." Finally, the trial court concluded that Ms. Brown had "not met the goals of eliminating the cause or the prospect of likely future abuse and neglect of [her] children by adequately protecting them from it."

I.

"[T]ermination of residual parental rights is a grave, drastic, and irreversible action," Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991). When considering termination of a parent's residual parental rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of Ms. Brown's residual parental rights to her five children on alternative grounds, i.e., under subsections (B) and (C) of Code § 16.1-283.

Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if

we so find, need not address the other grounds.  See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Pursuant to Code § 16.1-283(B), a parent's residual parental rights

> may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1.  The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2.  It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. . . .

The record amply supports the trial court's finding that each of Ms. Brown's children suffered from such neglect and abuse as to present a serious and substantial threat to his or her life, health, or development.  The record also supports the trial court's finding that it was not reasonably likely that the conditions which resulted in the children's abuse and neglect can be substantially corrected or eliminated so as to allow the safe return of the children to Ms. Brown within a reasonable time period.

Ms. Brown argues, however, that the trial court erred by failing to consider the efforts she made towards remedying the conditions that led to the children being removed from her care and custody.  Nothing in the record supports that contention.  NDSS acknowledged Ms. Brown, after initial refusals to do so, participated in the programs the department offered.  In addition, the trial court recognized that Ms. Brown "after initial difficulty and unwillingness" undertook efforts at evaluations, assessments, therapy, and parenting classes.  However, the trial court concluded from the evidence that Ms. Brown "has not ever accepted and indeed continues to deny the underlying trauma of her children, and she will not or cannot adequately protect these children

from the continuation of the afflicting abuse and neglect that occurred while they were in her care."

In its role as fact finder, the trial court did not find Ms. Brown to be credible, and concluded that she had not ceased her ongoing relationship with Mr. Brown, "who was at a minimum a substantial contributor to the children's trauma in their home situation." The trial court noted that Ms. Brown did not currently maintain a stable or even a minimally suitable residence for the children and would not be able to provide one in the foreseeable future. Accordingly, the trial court determined that it was not likely that the conditions which resulted in the neglect and abuse of the children could either be substantially corrected or eliminated to allow their safe return to mother within a reasonable time. Thus, the trial court concluded that termination of Ms. Brown's residual parental rights was in the children's best interest.

Based on our review of the record, we conclude that the trial court's decision was not plainly wrong or without evidence to support it. Credible evidence supports the trial court's findings that the neglect and abuse suffered by the children presented a substantial threat to their life, health, and development and that Ms. Brown failed to substantially remedy the conditions that resulted in the removal of the children from her care and custody and their placement into foster care. Accordingly, we will not disturb the trial court's decision on appeal.

II.

Ms. Brown also argues that the trial court abused its discretion in denying her motion that the trial judge meet in chambers with V.C. In denying that motion, the trial court concluded that V.C. "was developmentally delayed and otherwise not at an age of discretion" under Code § 16.1-283(G), and therefore, even if V.C. objected to the termination, the trial court would not give weight to her testimony.

The record reflects that V.C. was enrolled in special education classes, was developmentally delayed, and suffers from sickle-cell anemia. Dr. Vaughan-Eden, as well as Brewster, V.C.'s current therapist, diagnosed V.C. as suffering from post-traumatic stress syndrome. Brewster also diagnosed V.C. as suffering from "adjustment disorder with depression."

Dr. Vaughan-Eden testified that V.C. was at the highest risk because she was unable to discuss the trauma she suffered. Dr. Vaughan-Eden noted that V.C. had scars on her body, yet she could not talk about how she got them due to fear and anxiety. Dr. Vaughan-Eden believed V.C. had been talking with Ms. Brown on the phone. V.C. told Dr. Vaughan-Eden that Ms. Brown had placed Mr. Brown on the phone and that he had reassured V.C. that they were going to get her back, but that "she really needed not, again, share their business with the community." V.C. presented to Dr. Vaughan-Eden as a child who was "willing to sacrifice and keep quiet, because . . . the goal is my parents had promised that I will return home if I keep quiet." Dr. Vaughan-Eden found that V.C. idealized her situation as if she had been coached. Dr. Vaughan-Eden testified that in making her recommendations to NDSS, she based her opinions, in part, upon actual physical evidence of sexual abuse of V.C. that she received.

Code § 16.1-283(G) provides as follows:

> Notwithstanding any other provisions of this section, residual parental rights shall not be terminated if it is established that the child, if he is fourteen years of age or older or otherwise of an age of discretion as determined by the court, objects to such termination. However, residual parental rights of a child fourteen years of age or older may be terminated over the objection of the child, if the court finds that any disability of the child reduces the child's developmental age and that the child is not otherwise of an age of discretion.

Based upon this record, the trial court did not abuse its discretion in concluding that V.C., although chronologically fourteen years of age, had a disability that reduced her developmental

- 12 -

age and that she was not otherwise of an age of discretion. Accordingly, the trial court did not err in denying Ms. Brown's motion that the trial judge talk to V.C. in chambers during the termination hearing.

For these reasons, we summarily affirm the trial court's decision.

Affirmed.