COURT OF APPEALS OF VIRGINIA

Present:    Judges Elder, Felton and Senior Judge Willis


CHRISTOPHER E. WILLIS

                                                        MEMORANDUM OPINION*
v.      Record No. 1844-05-1                                 PER CURIAM
                                                          FEBRUARY 7, 2006
CITY OF PORTSMOUTH
  DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Dean W. Sword, Jr., Judge

(Tanya L. Lomax, on brief), for appellant.

(G. Timothy Oksman, City Attorney; Shelia C. Riddick, Deputy City
Attorney; Gregory K. Matthew, Guardian *ad litem* for the minor
child, on brief), for appellee.


Christopher Willis contends the evidence was insufficient to support the trial court's

decision terminating his residual parental rights to his minor daughter pursuant to Code

§ 16.1-283(C)(1) and (2). Upon reviewing the record and the briefs of the parties, we conclude that

this appeal is without merit. Accordingly, we summarily affirm the trial court's decision. See Rule

5A:27.[1]

---

    * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

    [1] In summarily affirming the trial court's decision, we hereby grant the motion of the City
of Portsmouth Department of Social Services to correct clerical errors in the July 14, 2005 final
order and dismiss the November 7, 2005 show cause order issued against Willis. We deem the
Written Statement of The Facts timely filed.

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).[2]

D.W., appellant's daughter, was born on December 30, 1996. D.W. has been in the legal custody of the City of Portsmouth Department of Social Services (PDSS) since August 6, 2001. Before that time, D.W. lived with her mother, her mother's live-in paramour, and her younger brother. PDSS took custody of D.W. on August 6, 2001 through an emergency removal when D.W.'s younger brother was murdered, allegedly by D.W.'s mother's live-in paramour. Subsequently, the paramour was convicted of murder. D.W.'s mother was convicted of felony child neglect, due to the death of her son, and she received a ten-year sentence.

On June 26, 1998, Willis was convicted in Georgia of child molestation and the statutory rape of his female cousin. The Georgia court sentenced Willis to fifteen years incarceration on both counts to run concurrently, with eight years to serve, and specific terms of probation, if granted, for seven years. Willis's conviction order contained specific terms with respect to his release. The conviction order stated: "He is to have no contact with children under the age of 18, etc., scouts, church youth, child care." The conviction order also stated, "Not to be alone with any person age 18 or under without adult supervision."

From 2001 through December 2004, PDSS worked to place D.W. with relatives and ultimately foster care, as neither biological parent was capable of providing a home for D.W. D.W. receives therapeutic foster care services. She experienced trauma before being placed in foster care, including, but not limited to the murder of her younger brother. The services

---

[2] The facts as set forth in this opinion are contained in the Written Statement of The Facts signed by the judge and the parties and made part of the record.

provided to D.W. through therapeutic foster care include individual therapy, medication management, and presently residential treatment services for her behavioral problems.

Initially, Dr. Patricia M. Fuss provided D.W. with individual therapy and Dr. Rajinder S. Dhillon oversaw D.W.'s medication management. Dr. Dhillon prescribed Adderall and Trazadone. Dr. Fuss provided specific instructions that any person acting as a caregiver for D.W. must administer medication consistently and provide continuous therapy. Dr. Fuss also recommended that D.W.'s parents have no contact with her.

On April 29, 2002, after a lengthy custody hearing, the Portsmouth Juvenile and Domestic Relations District Court (Portsmouth J&DR court) awarded physical custody of D.W. to her paternal grandmother, Willis's mother, and paternal step-grandfather. On May 3, 2002, D.W. began living with them. The paternal grandparents failed to comply with Dr. Fuss's instructions for D.W.'s care and, therefore, failed to comply with the court order. The grandparents discontinued D.W.'s therapy and did not consistently follow the recommended medication management plan. D.W. remained in the grandparents' home from May 2, 2002 to May 19, 2003. At that point, the paternal grandmother asked PDSS to remove D.W. from her home because she could not manage D.W.'s behavior. From May 19, 2003 to the present, D.W. has been in the physical custody of PDSS. When physical custody was returned to PDSS, D.W. was emotionally unstable. She was diagnosed with Post Traumatic Stress Disorder, Hyperactive ADHD, and attachment issues. She received weekly individual therapy sessions and treatment from Robin Rukin, LPC. D.W. was prescribed Concerta, Abilify, Zoloft, Adderall, Seroquell, and Depakote.

Rukin, qualified as an expert witness in child psychology and the treatment of children with emotional disabilities, recommended that D.W. have no contact with her parents or any family member who would allow contact with any person associated with the trauma she

experienced surrounding her brother's death. Rukin would testify that D.W. needed indefinite therapy and a very structured environment with detailed consequences for her behavioral problems.[3] Rukin would also state that D.W.'s caregiver should display a great deal of love and patience and receive special training to deal with behavioral problems and emotional needs. Rukin would testify that D.W.'s caregiver should know how to restrain her, as well as how to keep her stimulated and engaged in activities.

Rukin would testify that D.W. had no relationship with Willis and that, in therapy, D.W. did not talk about him. D.W. had stated in therapy that her father was in jail for drugs. Rukin opined that D.W. was intelligent, but would have difficulty bonding with anyone unless she felt safe and knew the person was committed to her regardless of her behavior. Rukin would testify that Willis could not bond with D.W. because of his incarceration and distance and because of the terms of his convictions. Rukin would opine that because of D.W.'s special emotional needs and because Willis cannot be alone with any child under the age of eighteen, he could not parent D.W. Rukin would testify that D.W. could not bond with anyone who could not give one-on-one care.

Rukin would testify that although it would be difficult for D.W. to bond with a caretaker, adoption is a viable goal. Adoption would provide D.W. with the stability of a family life needed in order for her to recover from trauma and post traumatic stress disorder. Thus, adoption is in D.W.'s best interest. D.W. still focuses on the events surrounding her brother's death.

Rukin would testify that all services that could be offered by PDSS to Willis to establish a parent-child relationship given his circumstances have been exhausted. Rukin opined that any

---

[3] At the trial court's termination hearing, all of PDSS's witnesses attested to the accuracy of their proffered testimony before the court as set forth herein.

contact with Willis would cause D.W.'s behavior to escalate out of fear. Rukin stated, "[D.W's] behavior can be very aggressive and physical at times. She also can be very impulsive, disruptive and very manipulative." Rukin remained D.W.'s therapist until June 8, 2005, when it was determined that D.W. needed to be placed in a residential treatment facility.

From May 19, 2003 until February 18, 2004, D.W. was placed in a therapeutic foster home with Carpe Diem. D.W. was moved because that family could not meet her needs and could not deal with her behavioral problems. On February 19, 2004, D.W. was placed in another therapeutic foster care home and remained in that placement until May 12, 2005. That family also could not handle D.W.'s explosive behavior. Thus, from May 13 to May 18, 2005, D.W. was placed in respite care in the City of Norfolk, Virginia for her behavior problems. From May 19 to May 24, 2005, D.W. was placed in a second respite care placement in the City of Chesapeake, Virginia for her behavioral problems. After that, from May 25 to June 8, 2005, she was placed at Safehaven, an emergency shelter. On June 8, 2005, D.W. was placed in a residential treatment facility, where she remains.

Since the time D.W. was placed in foster care in 2001, PDSS provided Willis with all of the foster care plans that outlined the goals and objectives for D.W. and her family. Willis, although incarcerated, never contacted PDSS to inquire about D.W. Willis did not send letters, notes, pictures, cards, toys, support, comments on the foster care plans, or make any attempts to be a part of D.W.'s life. Willis was contacted to sign an IEP form that required D.W.'s parents' signatures so she could participate in special education services in school. Willis did not return the form.

Since D.W. has been in the custody of PDSS, she has received the following services: anger management techniques, outpatient therapy, crisis intervention services, structured

therapeutic foster home placements, art and play therapy, social and recreational services, medication management, biofeedback sessions, inpatient therapy, and residential placement.

Sharon Banks, D.W.'s social worker from August 2001 to May 2002 and from May 2004 to the present, has seen D.W. at least monthly. Banks would testify that adoption is a viable goal for D.W. Banks would state that there are many families that want to adopt special needs children. She testified that there are no barriers for placing D.W. for adoption, but for the termination of Willis's residual parental rights. Banks would testify that D.W. talks often about having an adoptive family. Banks would testify that D.W. misbehaves in her foster care home in hopes of speeding her adoptive placement. Banks would testify that D.W. has no relationship with Willis, and has never asked about him nor asked to see him.

On January 21, 2005, Willis signed a permanent entrustment agreement with PDSS surrendering all of his parental rights to D.W. That agreement gave PDSS the authority to place D.W. for adoption. PDSS filed a petition with the Portsmouth J&DR court asking the court to terminate Willis's residual parental rights to D.W. and for authority to place D.W. for adoption, pursuant to Code § 16.1-277.01. On the date of the scheduled hearing on the petition, March 21, 2005, Willis, through his court-appointed guardian *ad litem*, revoked his permanent entrustment agreement with PDSS. The Portsmouth J&DR court gave PDSS leave to amend its petition to allow for termination of Willis's residual parental rights under the provisions of Code § 16.1-283 and scheduled the hearing for May 6, 2005. On that date, the Portsmouth J&DR court terminated Willis's residual parental rights to D.W., pursuant to Code § 16.1-283(B), (C)(1), and (C)(2).

Willis appealed that judgment to the trial court. At a July 14, 2005 hearing, the trial court heard the evidence as summarized above. The trial court also received in evidence Willis's

Georgia felony conviction order for statutory rape and child molestation, wherein he received a sentence of fifteen years incarceration on each offense to run concurrently.

PDSS objected to Willis's request for a family friend, Brenda Joseph, to take custody of D.W, on the grounds that the goal for D.W. is adoption, she is currently in a residential treatment facility, her special emotional needs require a very special adoptive placement with a family that has special training to deal with her issues, and Joseph does not have any special relationship with D.W. and has seen D.W. only once in her life.

At the termination hearing, Willis's guardian *ad litem* proffered that Willis is incarcerated and that Willis believes D.W. will be moved from place to place because of her emotional instability and behavioral problems. Willis does not believe that PDSS will be able to place D.W. in an adoptive home. Willis was raised by Joseph, and he would like D.W. placed in Joseph's care until his release or until other arrangements can be made. Willis's guardian *ad litem* also stated that Joseph had indicated that Willis might be paroled earlier than anticipated.

Gregory Matthews, guardian *ad litem* for D.W., stated that Willis failed to maintain contact with D.W. and failed to substantially plan for her future. Matthews stated that PDSS had offered Willis all possible services given his incarceration, his conviction, and conditions of probation. Matthews agreed with PDSS's position, and stated that the best interest of D.W. would be continued foster care until adoption.

Based upon this record, the trial court terminated Willis's residual parental rights pursuant to Code § 16.1-283(C)(1) and (2). The trial court found there was no relationship or bond between Willis and D.W. The trial court considered D.W.'s special emotional needs, the length of time she had been in foster care, the length of time of Willis's absence, and the sentence Willis received and the terms of his probation upon his release in determining that

D.W.'s best interest is termination of Willis's residual parental rights. The trial court granted

PDSS the authority to proceed with D.W.'s adoption placement.

> "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it."

Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citations omitted). Recognizing that "'[t]he

termination of [residual] parental rights is a grave, drastic and irreversible action,'" Helen W. v.

Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)

(citation omitted), we, nevertheless, "'presume[] [the trial court has] thoroughly weighed all the

evidence [and] considered the statutory requirements,'" Logan, 13 Va. App. at 128, 409 S.E.2d

at 463 (citation omitted).

Code § 16.1-283(C)(1) provides in pertinent part as follows:

> The residual parental rights of a parent . . . of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent . . . or other voluntary relinquishment by the parent . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

> The parent  . . . [has], without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent . . . and to strengthen the parent-child relationship. Proof that the parent . . . [has] failed without good cause to communicate on a continuing and planned basis with the child for a period of six months shall constitute prima facie evidence of this condition . . . .

Based upon this record, clear and convincing evidence proved that Willis had absolutely

no relationship whatsoever with D.W. from the time she was placed in foster care in August

2001 up through the time of the termination hearing. By that time, D.W. was approximately

eight and one-half years old and had been in foster care and/or residential treatment for over four years. During that time period, Willis was incarcerated and serving a fifteen-year sentence for child molestation and statutory rape in Georgia. However, notwithstanding his incarceration, Willis, without good cause, never directly or through someone on his behalf contacted PDSS to inquire about D.W., even though PDSS made efforts to communicate with Willis and involve him in D.W.'s life. In addition, Willis never provided or substantially planned for D.W.'s future prior to the termination hearing. Willis never sent letters, cards, pictures, toys, or support to D.W., nor did he ever comment upon the IEP sent to him or the foster care plans sent to him by PDSS. In essence, Willis never communicated with PDSS or D.W. in any manner from the time D.W. entered foster care in 2001 up to the time of the termination proceedings. Accordingly, because the trial court's decision terminating Willis's parental rights pursuant to Code § 16.1-283(C)(1) was supported by clear and convincing evidence, we will not disturb it on appeal.

Willis also contends the trial court erred in terminating his residual parental rights pursuant to Code § 16.1-283(C)(2). However, where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988). Thus, because we find that clear and convincing evidence supported the trial court's termination of Willis's residual parental rights under Code § 16.1-283(C)(1), we need not address the trial court's ruling terminating Willis's residual parental rights under Code § 16.1-283(C)(2).

The record supports the trial court's finding that PDSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(C)(1). Accordingly, we summarily affirm the decision of the trial court. <u>See</u> Rule 5A:27.

<u>Affirmed.</u>