## Alexandria

## HELEN AND ROBERT W.

v.

## FAIRFAX COUNTY DEPARTMENT OF HUMAN DEVELOPMENT

No. 0221-90-4

Decided July 1, 1991

COUNSEL

John M. DiJoseph (Sattler & DiJoseph, on briefs), for appellant.

Ann Gouldin, Assistant County Attorney; Helen Leiner (David T. Stitt, County Attorney; Robert Lyndon Howell, Deputy County Attorney, on brief), for appellee.

OPINION

KEENAN, J.—Helen W. (mother) and Robert W. (father) appeal the trial court's order terminating their residual parental rights to their daughter, Sarah, and granting custody of Sarah to the Fairfax County Department of Human Development (Department). The parents raise five issues on appeal: (1) whether the termination order violated their fourteenth amendment rights to

both substantive and procedural due process and equal protection; (2) whether the trial court erred in finding that they did not make reasonable efforts to remedy the conditions which led to the placement of Sarah in foster care; (3) whether the trial court erred in denying their motion for discovery; (4) whether the trial judge erred in denying their motion that he recuse himself; and (5) whether the trial court erred in denying their motion for a jury trial. In addition, the father argues that the trial court erred by terminating his parental rights, because in so doing, the trial court held him responsible for the actions of his wife. We find that the trial court did not err in its decision that termination of both parents' residual parental rights was in the best interests of Sarah. We further find no merit in the parents' procedural arguments. Accordingly, we affirm the decision of the trial court.

Sarah W. is a seventeen-year-old multiply handicapped child. She suffers from severe retardation and hearing loss, possessing the functional skills of a two-year-old child. She has a number of physical disabilities, including a cleft palate, congenital heart disease, visual atrophy in one eye, microcephalas and retarded growth rate. Prior to her placement in foster care, Sarah engaged in self-abusive behavior, was not toilet trained, and was unable to communicate or get around unassisted.

The Department first became involved with the family in November 1983. Prior to May 1986, the juvenile court ordered that Sarah attend the Kilmer Center School, which has a special education program for severely mentally retarded and multiply handicapped students. Sarah attended the school on May 7 and 8, 1986 and May 20, 21 and 22, 1986. The Department obtained an emergency removal order and took custody of Sarah on May 28, 1986, after being apprised by the school of Sarah's absences.

Once Sarah was placed in foster care, the parents were offered weekly supervised visitation with her, and by August 1986, unsupervised day visits were taking place. When the initial unsupervised overnight visit was successful, a second overnight visit was scheduled. The parents did not return Sarah at the appointed time, but instead kept her for a consultation with a physician in Virginia Beach regarding cleft palate surgery. Several days later, Sarah's child protective services worker (worker) received a call from a Virginia Beach physician. The physician reported that the parents were seeking to have Sarah hospitalized for scratches and

abrasions, but stated that he did not believe that hospitalization was required. Although the worker instructed the parents to return Sarah to the Department, she received a second call from the father later that day indicating that Sarah was being admitted to Fairfax Hospital.

Sarah was released from Fairfax Hospital on September 4, 1986. Instead of returning Sarah to the Department, the mother took Sarah back to Virginia Beach, where she was again admitted to the hospital. Sarah's worker then contacted the father and asked him to bring Sarah back. When he refused, Sarah's worker went to pick her up from the hospital. Sarah had abrasions on her face. In addition, the skin on her face and legs was raw and bleeding, and she was very agitated. The mother called the police in an attempt to prevent the worker from taking Sarah from the hospital. Overnight visitations were discontinued at this time and replaced with supervised visitation at the Department. Neither parent attended many of the scheduled visitations.

In November 1986, Sarah was diagnosed as having a cholesteatoma in her ear. The parents were opposed to surgery, so a CAT scan was performed which confirmed the need for surgery. Surgery was then scheduled for February 3, 1987. On that day, the parents objected to the surgery being performed, stating that they wanted it done at a different hospital. The surgery was rescheduled for April 13, 1987. The Department obtained court ordered consent to the surgery after Sarah's physician explained that her condition was life threatening. On April 10, 1987, the parents filed a suit in federal court to block the surgery and called the physician, stating that they were opposed to her performing the surgery. Sarah's physician then cancelled the procedure. Sarah finally underwent surgery in July 1987, pursuant to a court order.

Sarah's worker scheduled an unsupervised day visit with the parents in July 1987 prior to her undergoing surgery. The mother did not return Sarah at the scheduled time. Sarah was finally located by the police at the parents' home late that evening. Both parents were present in the home, but neither had notified the Department as to Sarah's whereabouts. In August 1987, during a supervised visit at the Department, the mother took Sarah from the Department and went over to the juvenile court when Sarah's worker left them alone for several minutes. The worker had not

given her permission to leave with Sarah.

Visitation was sporadic after this and the mother was often agitated and abusive towards Sarah's worker during the visitation. On one occasion, in February 1988, she wrapped herself around Sarah and screamed that Sarah was being abused. When the father was notified by Sarah's worker that visitations could not continue in this manner, he told the worker that she was trying to break the family apart. Thereafter, Sarah's worker refused visitation unless the father was present. The next visit did not occur until July 1988 and both parents attended. Two subsequent family visits went well.

A third family visit, in August 1988, had to be ended when the mother became agitated and upset. She was verbally abusive to Sarah's worker and foster mother. The following day, Sarah was visibly upset, engaged in self-abusive behavior and had to leave school early. All visitation between the parents and Sarah was terminated at this time.

Both parents were instructed by the foster care services plan and the court order to undergo mental health evaluations and treatment. Cathy Pumphrey, an expert clinical psychologist who evaluated them, diagnosed the mother as suffering from paranoid schizophrenia. She concluded that the mother's ability to parent Sarah was significantly impaired because she was unable to trust anyone and operated under a paranoid delusional system. Pumphrey diagnosed the father as suffering from paranoid personality. She concluded that the parents' paranoid system was well entrenched and that both parents were incapable of parenting Sarah.

The parents saw two different therapists between October 1986 and June 1987. In November 1987, the Department offered the parents the opportunity to participate in a psychiatric evaluation with Dr. Straw, with the understanding that Sarah would be returned home if Dr. Straw concluded that Sarah could be safely returned. Although the parents met with Dr. Straw twice, he was unable to finish his evaluation because the mother refused to meet with him alone.

The parents met with Dr. Straw again in December 1988, after the juvenile court continued the Department's termination pro-

ceeding to enable the parents to complete the evaluation and undergo therapy. Dr. Straw asked the father to present a plan that would ensure that Sarah would receive assistance from third party providers, since this was critical to Sarah's safety and well-being. This plan was not presented until the case came back before the juvenile court for review. As a result, Dr. Straw concluded that Sarah could not be safely returned home because the plan did not adequately address his concerns as to third party providers, was not timely presented, and suggested a course of conduct which he believed would only exacerbate the parents' long history of problems in dealing with third party providers.

The juvenile court terminated both parents' residual parental rights on May 11, 1989 and approved the foster care service plan documenting a program goal of adoption. A trial *de novo* was held in circuit court on September 27, 1989. Prior to the trial, the parents filed a discovery request and a plea in equity, demanding a jury trial. Both motions were denied. At the hearing, they also requested that the trial judge recuse himself, due to his earlier involvement in the foster care placement, medical treatment and school issues. This motion was also denied. The circuit court terminated both parents' residual parental rights pursuant to Code § 16.1-283(C) by order entered January 30, 1990 and approved the foster care service plan recommending a program goal of adoption. This appeal followed.

Initially, the parents argue that the termination order violated their fourteenth amendment rights to the "care, custody and companionship" of their daughter because the trial court failed to consider less drastic alternatives, there was no showing that either parent was unfit, and they were not put on notice of what was required to prevent termination of their rights. Further, they claim that their visitation was improperly terminated without an opportunity to be heard, in violation of their due process rights.

The Department responds that ample evidence was presented supporting the trial court's finding that termination was in Sarah's best interests and that the conditions of Code § 16.1-283(C) had been met. Moreover, the Department maintains that once these conditions are met, a further showing of unfitness is not required. Finally, the Department maintains that the parents knew what was required of them by the Department and the court, and it was their own refusal to utilize the services provided to properly care

for Sarah which led to the termination of both visitation and residual parental rights.

"The termination of [residual] parental rights is a grave, drastic and irreversible action." *Lowe v. Department of Pub. Welfare of the City of Richmond*, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986). Consequently, "[w]hile it may be occasionally necessary to sever the legal relationship between parent and child, those circumstances are rare." *Weaver v. Roanoke Dep't of Human Resources*, 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). Code § 16.1-283 provides the framework in which the trial court can terminate parental rights. In the case before us, the parents' rights were terminated pursuant to Code § 16.1-283(C). That section provides in pertinent part:

> The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

> \* \* \*

> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period not to exceed twelve months to remedy substantially the conditions which led to the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Initially, we reject the parents' argument that Code § 16.1-283 is void for vagueness, since the statute contains "clear and specific guidelines for its application in particular cases." *Knox v. Lynchburg Div. of Social Servs.*, 223 Va. 213, 223, 288 S.E.2d 399, 404 (1982). Moreover, in the case before us, numerous court orders were entered by the trial court during the pendency of Sarah's placement in foster care which directed the parents to take specific actions necessary for Sarah's care. The Department also filed foster care service plans outlining the steps which the parents had to take before Sarah could be returned home. Finally, as early as the spring of 1988, Sarah's worker told the father that the case was headed toward termination if the difficulties in the parents' visitation with Sarah were not resolved. Based on this rec-

ord, we find unpersuasive the parents' claim that they did not have fair warning of what was required to retain custody of Sarah.

We also reject the parents' claim that the termination order deprived them of a fundamental liberty interest in the "care, custody and companionship" of Sarah, in violation of their fourteenth amendment rights. The parents claim that less drastic alternatives were available to the state, including the placement of Sarah with other family members or relatives, or Sarah's continued custody with the parents, subject to appropriate monitoring procedures.

██ Code § 16.1-283, by its very nature, "contemplates the use, where possible, of alternatives less drastic than termination of parental rights." *Edwards v. County of Arlington*, 5 Va. App. 294, 312, 361 S.E.2d 644, 654 (1987) (quoting *Knox*, 223 Va. at 223, 288 S.E.2d at 404). In the case before us, no evidence was presented that the alternatives suggested by the parents were available. First, the record does not demonstrate that other family members or relatives were able and willing to care for Sarah. In addition, the parents' long history of conflict with both the Department and other third party providers belies their claim that appropriate monitoring procedures could be utilized, enabling them to retain custody of Sarah.

The record shows that supervised visitation, when it occurred, was fraught with conflict between the mother and Sarah's workers. The father either would not participate or, when he did, was unable to alleviate the conflict. Furthermore, after the visits, Sarah was agitated and upset. When allowed unsupervised visitation, the parents repeatedly violated the conditions placed on the visitation and frequently removed Sarah to unknown locations. During one of these episodes, Sarah inflicted serious injuries to herself, which took more than a month to heal.

In addition, the parents refused to participate in recommended mental health treatment, in spite of requirements in the foster care service plan and court orders that they do so. Cathy Pumphrey, a clinical psychologist who evaluated the parents, diagnosed them as suffering from paranoid delusions. She concluded that the parents shared a paranoid system that was well entrenched, that their prognosis was poor and that as a result, they were incapable of parenting Sarah. Further, the record at trial

discloses that the parents repeatedly refused to cooperate with third party providers regarding Sarah's educational program and medical needs and that they were unable to accept Sarah's handicaps and limitations. Dr. Straw, a psychiatrist, advised the trial court that the parents' continued inability to work with third party providers made it unsafe for Sarah to return to their care, since third party care was critical for her safety and well-being.

■ Based on this record, we find that the trial court did not err in concluding that the parents were unable or unwilling to remedy the conditions which led to Sarah's placement in foster care, and that continued custody in the parents was not in Sarah's best interests. Consequently, continued custody in the parents was inconsistent with the purposes of Code § 16.1-283 and was not an alternative to the termination of parental rights. Furthermore, once the trial court determined that the factors listed in Code § 16.1-283(C)(2) existed, this became tantamount to a finding of parental unfitness and no separate finding of unfitness was necessary. *See Harris v. Lynchburg Div. of Social Servs.*, 223 Va. 235, 241, 288 S.E.2d 410, 413 (1982). Since no evidence was presented that less drastic measures were available to the trial court, and the statutory requirements for termination of parental rights were met, we find that the trial court's order terminating the parents' residual parental rights did not violate their fourteenth amendment due process rights.

■ In addition, we find that the Department's decision to terminate visitation in August 1988 did not violate the parents' procedural due process rights. Code § 16.1-283(C)(2) does not require parental visitation in every case where a social service agency assumes responsibility for the foster care of a child. "The question must be resolved . . . in light of the facts of each case, with the best interests of the child as the guiding principle." *Toombs v. Lynchburg Div. of Social Servs.*, 223 Va. 225, 230, 288 S.E.2d 405, 407 (1982). In the case before us, continued attempts were made by the Department to allow both parents supervised and unsupervised visitation for a period exceeding two years. The visitations were marked by conflict and were often detrimental to Sarah. The Department advised the father in early spring 1988 that this pattern could not continue. Visitation was finally ended in August 1988 when, after an extremely difficult session, the mother screamed into an audio trainer used by Sarah to enhance her

hearing. Three months later, the juvenile court continued the prohibition on the parents' visitation until Dr. Straw could finish his evaluation. Based on this record, we find that the Department's restriction on visitation promoted Sarah's best interests and was validated by court order after a hearing. Consequently, no procedural due process violation occurred.

We also find no merit in the parents' argument that the termination order violated their equal protection rights. In determining that termination was warranted under Code § 16.1-283, the trial court is bound to consider the best interests of the child. Sarah is a multiply handicapped child. As a result, special needs must be met in order to serve her best interests. Dr. Straw advised the court that because of Sarah's physical and mental handicaps, the family is incapable of providing all of her care. Thus, he concluded that the ability of the parents to work with third party providers was "critical" to Sarah's safety and well-being in the home. He also concluded to a reasonable degree of psychiatric certainty that the parents were unable to work with third party providers to address Sarah's needs.

We reject the parents' contention that the trial court's order deprived them of equal protection based on the fact that they were the parents of a handicapped child. The trial court found that the parents' continued inability to work with third party providers directly affected Sarah's safety and well-being. Because of Sarah's handicap, this was a crucial step in determining whether continued custody with the parents was in Sarah's best interest. Furthermore, the trial court found that the parents had refused medical treatment to correct a life-threatening condition and resisted efforts to develop an appropriate educational program for Sarah. The court concluded that the Department had proved by clear and convincing evidence that termination of parental rights was in Sarah's best interest. Moreover, the Department presented clear and convincing evidence that the parents had refused to remedy the conditions which led to Sarah's placement in foster care pursuant to Code § 16.1-283(C)(2). These findings are amply supported by the evidence.

Based on this record, we find that the trial court did not apply a different standard in making its decision to terminate the parental rights of Robert and Helen W. due to the fact that they were the parents of a handicapped child. The parents were afforded the

same protections as any parents facing a termination procedure, and were not deprived of their fourteenth amendment guarantee of equal protection.

The parents also argue that the trial court erred in finding that the termination of parental rights was appropriate under Code § 16.1-283(C) because they demonstrated good cause for failing to remedy the conditions which led to Sarah's placement in foster care. They claim that their unwillingness to allow Sarah to undergo aural surgery and their refusal to cooperate with the Kilmer Center were based on expert medical and legal advice, which they were entitled to follow. We disagree.

Although the parents sought expert advice regarding Sarah's medical treatment and education, they were still subject to court order to have Sarah attend the Kilmer Center School and have the cholesteatoma surgically removed. Thus, if the parents possessed information that this course of action was not beneficial to Sarah, their remedy was to have the trial court modify its orders or challenge the orders on appeal, not simply ignore them and follow their own course of action. We find that the mere fact that the parents' experts disagreed with the trial court's orders does not constitute sufficient good cause to excuse the parents' failure to remedy the conditions which led to Sarah's placement in foster care. Further, no evidence in the record establishes that the parents advised either the Department or the court that they were financially unable to participate in the programs and services required as part of the foster care services plan.

The parents argue that the trial court erred by denying their request for the production of documents and interrogatories on DSS. "The granting or denying of a [discovery request] is a matter within the trial court's discretion and will be reversed only if the action taken was improvident and affected substantial rights." *Rakes v. Fulcher*, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970). Assuming without deciding that the parents were entitled to discovery, the record does not support a finding that the parents suffered any prejudice from the denial of their discovery motion.

Further, we find no merit in the parents' claim that they were entitled to a jury trial pursuant to Code § 8.01-336(D). The parents claim there were no facts supporting termination and, thus, their plea reduced the proceedings to a single issue. The advan-

tage of a defense by plea is that it shortens the litigation by reducing the issue to a single point. *Campbell v. Johnson*, 203 Va. 43, 47, 122 S.E.2d 907, 909 (1961). Unlike an answer, a plea in bar presents a distinct issue of fact. *Id.* The parents' plea did not limit the litigation to a single point but rather was the crux of the proceedings. Consequently, we find that it was not the type of action governed by Code § 8.01-336(D).

■ In addition, we find that the trial court's denial of the parents' motion to recuse was not an abuse of discretion. The fact that the trial judge is familiar with the parties and their legal difficulties through prior judicial proceedings is not sufficient to establish bias. *Deahl v. Winchester Dep't of Social Servs.*, 224 Va. 664, 672, 299 S.E.2d 863, 867 (1983). No evidence in the record establishes that the trial judge possessed such bias or prejudice as a result of his prior involvement in this case as to deny the parents a fair trial.

Finally, we reject the father's claim that his rights were improperly terminated because the court imposed vicarious liability on him for the actions of his wife. The record is replete with examples of the father's failure to remedy the conditions which led to Sarah's placement in foster care. He repeatedly refused to cooperate with school officials, Sarah's workers, and mental health professionals. Further, he made only minimal efforts to comply with the foster care services plan, and acted with the mother in blocking Sarah's surgery and school participation.

Cathy Pumphrey concluded that, although the father's personality disorder was not of a psychotic nature, as was the mother's, that the paranoid system they shared made both parents incapable of parenting Sarah. Dr. Straw indicated that the family system compromised the father's abilities to meet Sarah's needs and that he was unable to devise a plan to remedy the parents' difficulties with third party providers. Based on this record, we find that the trial court did not err in finding that clear and convincing evidence supported the termination of the father's residual parental rights under Code § 16.1-283(C).

For the reasons stated, we affirm the order of the trial court terminating the residual parental rights of Helen W. and Robert W.

*Affirmed.*

Koontz, C.J., and Benton, J., concurred.