COURT OF APPEALS OF VIRGINIA


Present:    Judge McClanahan, Senior Judges Coleman and Annunziata


MICHAEL A. WILLIAMS

                                                    MEMORANDUM OPINION[*]
v.        Record No. 0023-06-1                         PER CURIAM
                                                       JULY 11, 2006
CHESAPEAKE DEPARTMENT OF
  HUMAN SERVICES


                FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                              Randall D. Smith, Judge

                (Del M. Mauhrine Brown; The Brown Law Office, on brief), for
                appellant.  Appellant submitting on brief.

                (John E. Oliver; Stephen Givando, Guardian *ad litem* for the infant
                children; City of Chesapeake Attorney's Office, on brief), for
                appellee.  Appellee and Guardian *ad litem* submitting on brief.


        Michael A. Williams appeals the trial court's decision terminating his residual parental

rights to his two minor children, R.W. and N.W., pursuant to Code § 16.1-283(C)(1) and (2).

Williams contends the trial court erred in terminating his parental rights (1) where there was no

evidence that he was beyond reasonable rehabilitative efforts and where social services agencies

made no effort to rehabilitate him before or after the children's removal from the home despite

his expressed interest in rehabilitation; and (2) when it violated his Fourteenth Amendment due

process rights by terminating his residual parental rights without first providing an opportunity

for rehabilitation where there was no indication that he was beyond reasonable rehabilitation

efforts.  Finding no error, we affirm the trial court's decision.[1]

------

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] In making his argument, Williams cites Code § 16.1-283(B)(1) and (2) as the basis for
the trial court's decision terminating his parental rights.  However, the trial court's final order

We view the evidence in the light most favorable to the prevailing party in the trial court and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence proved that on July 8, 2002, R.W., then seven years old, and N.W., then almost fourteen months old, came into the custody of the Chesapeake Department of Human Services ("CDHS"), upon petitions filed by CDHS alleging that the children were abused and/or neglected while in the care of Kristle White ("mother").[2] At that time, CDHS had no information regarding the identity or whereabouts of Williams, the children's father. Mother was twenty-one years old, unemployed, has an IQ of 56, and suffers from cognitive deficits and learning disabilities so significant that she was found by the Social Security Administration to be disabled.

On July 8, 2002, the Chesapeake Juvenile and Domestic Relations District Court ("the JDR court") entered *ex parte* orders authorizing the emergency removal of the children from their mother. On July 12, 2002, during a subsequent preliminary hearing pursuant to Code § 16.1-252, mother appeared and stipulated to the allegations contained in CDHS's petitions, acknowledging that she had been unable to maintain a stable or appropriate home for the children, had been unable to maintain appropriate supervision for them, and had been unable to obtain the medical care that the children needed. She admitted at that time that she was unable to care for the children and that she needed help in finding the means to establish a home and raise the children. She acknowledged that there were no extended family members available to care for the children, and she agreed that they needed the care and supervision provided by their

---

makes clear that Williams' rights were terminated under Code § 16.1-283(C)(1) and (2). Accordingly, we address the propriety of the trial court's decision pursuant to those provisions.

[2] The petitions also pertained to another child, D.W., who is not Williams' biological child.

foster care placement. The JDR court continued temporary legal custody of the children with CDHS, and directed mother to cooperate with CDHS in developing and carrying out the foster care plans for the children.

After the July 12, 2002 hearing, CDHS developed foster care plans for the children with mother. CDHS identified housing, medical care, parenting skills and supervision, employment, and mother's limited cognitive capacity as key issues that needed to be addressed in order for the children to be reunited with her. CDHS referred mother for a parenting and psychological evaluation. CDHS maintained a visitation schedule during that time for mother. Her interactions with the children during the visitations were described as "childlike."

Based upon information obtained from mother on July 17, 2002, CDHS tried to contact Williams at a home located at 4221 Wake Avenue in Chesapeake, Virginia, which mother identified as Williams' residence. No one answered their efforts to contact Williams at this address. Later, CDHS sent a letter to Williams at that address informing him that the children were in foster care. Although the letter was not returned to CDHS, Williams did not respond to it or to a message left at the address earlier. Mother told CDHS that Williams failed to attend the scheduled visitation on August 10, 2002 because he had to work.

At a September 27, 2002 hearing, CDHS submitted that while mother was cooperating with their efforts to provide services and was participating in an evaluation and parenting assessment, she was showing no independent ability to arrange and make appointments for her services and was almost completely dependent on her CHIP/Healthy Families worker to manage her needs. CDHS also submitted that mother had been found by the Social Security Administration to be disabled from employment due to a learning disability, that she had tested positive for HIV, that the CHIP worker was taking most of the initiative to arrange treatment for mother's HIV, that mother had no stable housing, and that the situation was unlikely to improve.

CDHS submitted a goal of "return to parent," but noted its serious concerns. CDHS noted that it had just learned the current address of Michael Williams, the father of R.W. and N.W. The JDR court ordered that legal custody of R.W. and N.W. be awarded to CDHS and approved foster care plans with the goal of "return home." Mother was directed to cooperate fully with CDHS, and the JDR court set a foster care review hearing for February 14, 2003.

In September 2002, Williams appeared for the first time for visitation with the children. At that time, Williams told the CDHS worker that he wanted to be involved with the children, but that he had to work a lot and that was why he had not previously attended visits. Williams saw the children for approximately forty minutes, but then had to leave for work. Williams was supposed to provide CDHS with information regarding the location of his workplace at the next visit, but he did not show up nor did he provide any information to CDHS regarding his employment.

Williams made no contact with the children or CDHS again until February 2003, a period of five months, when he met with Valerie Parker, the foster care social worker for the children at the time. Williams appeared at CDHS with mother for a supervised visit with the children. Williams told Parker that he planned to help mother and be involved in the children's lives. Williams told D.W. that he was going to do everything he could to try and get the family back together. Parker believed that Williams was sincere at the time. Parker met with Williams after the visit and gave him her card. She asked him to call her so they could set up a meeting to "incorporate him into a service plan." Williams took the card and agreed to call Parker and schedule an appointment. Parker never heard from Williams.

A few months later, Parker went to the address that Williams had provided to her. She was unable to locate Williams.

Parker did not see Williams again until almost nine months later, on October 23, 2003, when he again came to CDHS with mother. When Parker asked Williams where he had been, he told her that he had been working two jobs. He stated that he had been living with mother for the past three months, but said he had no transportation. During those past months, mother had said nothing to Parker about Williams living with her. Parker reviewed the service plan with Williams and told him she needed him to complete a psychological evaluation and that CDHS would be willing to transport him to the evaluation.

Earlier in October 2003, Karen Sparling of First Home Care had two contacts with Williams. On October 3, 2003, she saw him outside mother's home during an unannounced visit, and on October 20, 2003, she spoke to Williams on the telephone. During both of those conversations, Sparling emphasized to Williams that the children were at risk of being placed for adoption if the situation in the home did not improve. Williams expressed his commitment to do whatever was necessary to retain his parental rights. However, after October 23, 2003, Williams had no further contact with Parker, CDHS, or the children.

As of the hearing date in the trial court, November 28, 2005, Williams was incarcerated. He acknowledged that his expected release date would be July 2006. He admitted he also had an outstanding probation violation for which he could be incarcerated an additional two years nine months. Williams provided no specific explanation for why he failed to maintain contact with the children or CDHS. He admitted he did not visit the children after the meeting with Parker and he did not contact Parker again even though he had her card. Williams maintained that he "couldn't do anything" after the children were removed because he was "constantly working," "staying with [his] aunt," and "things just weren't right for [him]."

Although multiple services were provided to mother in an effort to improve her ability to care for the children so they could safely return home, mother was unable to change the

- 5 -

conditions and problems that led to the children's removal from the home. Both children suffer from significant developmental delays that require a caretaker who is attentive and involved in all aspects of their care and development.

Based upon this record, the trial court terminated Williams' residual parental rights to R.W. and N.W., and continued legal custody of the children with CDHS with the authority to place them for adoption and consent thereto.

"'[T]ermination of [residual] parental rights is a grave, drastic, and irreversible action.'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)).

> When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." "In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." The trial court's judgment, "when based on evidence heard *ore tenus,* will not be disturbed on appeal unless plainly wrong or without evidence to support it."

Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citations omitted).

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of Williams' residual parental rights to his two children on alternative grounds, i.e., under subsections (C)(1) and (C)(2) of Code § 16.1-283.

Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Code § 16.1-283(C)(1) provides in pertinent part that residual parental rights may be terminated if the court finds by clear and convincing evidence that termination is in the child's best interest and that the parent has failed, without good cause, to maintain continuing contact with the child and to provide for or substantially plan for the child within six months of the child's placement in foster care, notwithstanding efforts by agencies to communicate with the parent and to strengthen the parent-child bond.

Here, it was undisputed that Williams knew his children had been placed in foster care shortly after their removal from mother's home in July 2002. He accompanied mother to a visit to see the children in September 2002, met with the foster care worker, and was aware of his need to participate in a service plan. Yet, he had no contact with the children or CDHS again until five months later, when he again accompanied mother to visit the children. CDHS again advised Williams of the need for him to participate in the service plan. The foster care worker gave Williams the necessary information so he could contact her, but he never did. Another eight months passed before Williams contacted the children or CDHS. On October 23, 2003, he visited the children by accompanying their mother to the CDHS offices. At that time, CDHS again informed Williams of the need for him to participate in the service plan for the children. The foster care worker reviewed the plan with him, and told Williams that he needed to undergo a psychological evaluation and that transportation would be provided for him. During that same time period, Sparling conducted an evaluation of the family and spoke with Williams about his obligations and need to participate in the service plan. Williams expressed his understanding of those obligations. Despite these reminders, Williams made no contact with CDHS or the children after October 23, 2003. Williams offered no good cause for his lack of contact with the children or failure to plan for their future.

Williams has made little or no effort to contact the children, to establish a relationship with them, or to plan for their future care. Although Williams indicated that he wants to obtain custody of the children, he did little toward that end despite the fact that he had been advised of the steps he needed to take in order to achieve that goal.

The children have been in foster care since July 8, 2002 and have not seen Williams since October 2003. They need permanency in their lives. They have developmental risk factors. They are doing well with their foster family and have formed deep bonds with their foster parents, who wish to adopt the children. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

This record supports the trial court's finding that the best interests of the children would be served by terminating Williams' parental rights pursuant to Code § 16.1-283(C)(1) and that Williams has failed to maintain continuing contact with the children and to substantially plan for the future of the children, notwithstanding the reasonable and appropriate efforts of CDHS. Accordingly, we affirm the trial court's decision.

Affirmed.