COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Clements and Haley


BOBBI JEEN CALLOWAY

                                                                MEMORANDUM OPINION*
v.        Record No. 2666-05-3                                  PER CURIAM
                                                                JULY 18, 2006
LYNCHBURG DIVISION OF SOCIAL SERVICES


                 FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
                          Mosby G. Perrow, III, Judge

                (James J. Angel, on brief), for appellant.

                (Susan L. Hartman, Assistant City Attorney; Eric G. Peters,
                Guardian *ad litem* for the infant children, on brief), for appellee.


        Bobbi J. Calloway, mother, appeals the trial court's decision terminating her parental rights

to her sons, nine-year-old M. and seven-year-old J., and claims the evidence is insufficient to

support the termination.  Upon review of the record and briefs of the parties, we conclude that this

appeal is without merit.  Accordingly, we summarily affirm the trial court's decision.  See Rule

5A:27.


                                        Background

        We review the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).  So viewed, the evidence proved

that foster care worker Sally Barca learned of an allegation that M. forced J. into a closet in

Calloway's home and made him suck his "weenie."  When a social worker investigated the

allegation, J. confirmed that it was true.  The social worker observed "sexual acting-out behaviors"

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

between the boys and talked to Calloway about services. Calloway refused to believe the allegations and declined services throughout the investigatory period. The Lynchburg Division of Social Services (LDSS) removed the boys from Calloway's home. During the foster care period, Calloway instructed the boys to "shut their mouths" whenever the issue was raised and called J. a liar. During approximately 50% of the visitations, Calloway was in a positive and playful mood but had difficulty controlling her sons' behavior and needed intervention to calm the situation. During the other 50% of the visitations, Calloway became tense and angry, would yell at the boys, punish them before they did anything wrong, threaten to leave them because of their behavior, and blame them for being in foster care. If the boys mentioned anything concerning sexual content or domestic violence, Calloway told them "to shut up and be quiet."

Sexual "acting out" between the boys was apparent when they went into foster care. As a result, the boys were placed in separate homes. The high amount of sexual energy between the boys was manifested by the boys "peeing on each other, peeing on teachers, talking about tits and butts, and . . . doing sexual gestures back and forth."

In addition, when M. came into foster care, his leg braces necessitated by his cerebral palsy were "severely outdated." Calloway acknowledged that she had failed to make the needed appointments for regular fittings.

An investigation revealed a confirmed history of sexual abuse of Calloway during her childhood. Calloway's mother told the boys that Calloway caused her own abuse because Calloway behaved badly. Calloway also had a history involving domestic violence, including an incident where she was the victim of a severe malicious wounding by her husband that M. was old enough to witness. When the possibility of visitation with this husband was mentioned, the boys became protective of Calloway. The boys recalled that after seeing Calloway engage in sexual activity, they

were slammed against the wall for having seen it. "[T]here was just a whole lot of sexual content going on in and around the situation."

A Child Protective Services history check on Calloway revealed a 2001 founded complaint for physical abuse incident with bruises, a 2002 founded complaint for neglect, and a 2003 founded complaint for physical abuse. As a result of the 2003 complaint, the matter was referred for ongoing services, but Calloway was not cooperative and failed to comply with efforts to enter counseling.

Dr. A. James Anderson conducted a psychological evaluation of Calloway and noted that "there is an I.Q. limitation there that creates a problem" and that Calloway is not able to recognize that a problem exists. "[T]he focus of services wasn't to go to the appointments; it was to make meaningful change. That hasn't occurred." Even as late as February 2005, Calloway felt no services were needed and failed to change her own behaviors. Anderson found that Calloway was immature and narcissistic, and was unable to recognize her children's needs and feelings or to put the children's needs ahead of her own. He found that Calloway misinterprets situations and is likely to overreact, leading to inconsistent parenting that may cause the children anxiety and confusion. In tests to determine parenting skills, Calloway failed to recognize the children's developmental needs, need for professional help, or the possibility of serious medical needs. The tests revealed that Calloway would have difficulty protecting the health and well-being of a child in her care. Calloway "cannot be considered a good risk as far as child abuse." In addition, Anderson was concerned about Calloway's acknowledged habit of consuming large quantities of alcohol. Anderson stated that multiple factors caused Calloway to be unable to parent her children, "including her intellectual limitations, her untreated substance abuse problem and personality factors." Anderson found that Calloway is "not motivated to do the things that are necessary, in my view, to qualify her to have the children back."

- 3 -

Dr. Deborah Maxey testified as an expert in "attachment, bonding and trauma," and stated that Calloway and Calloway's mother were preoccupied with themselves and had their own needs met by asking the children to care for them and help them feel better. Maxey noted that Calloway and her mother treated J. and M. differently and that they "rejected and rebuffed" J. The boys became aroused and aggressive as they tried to have their needs met and exhibited "disorganized attachment patterns." Children who are rebuffed and rejected begin to believe they are "subdefective, that they're not as good as other people." Maxey also observed that Calloway micromanaged her children at a level that caused disruptive behaviors. The children often left their visits disturbed and upset. Maxey noted that when M. visited Calloway, his physical impairments were more pronounced because the anxiety "crimped him up," whereas when M. was with his foster parents he was more settled and not physically impaired.

Maxey discussed her observations with Calloway and asked why she thought her children had been removed. Calloway responded that there was no problem and "that it was all a bunch of crock." She denied any responsibility for problems and said she had never been neglectful. When asked whether she had learned to be a better parent, Calloway said she would try to talk to her children "better," but that "I haven't changed my parenting skills, ain't nothing changed." Calloway said "there had been no change in the way she looked at the situation or how she went about parenting."

Don Wilhelm, a clinical social worker, worked with J. and M. and noted that they appeared to be traumatized, had low self-esteem, and were anxious and insecure. The boys had to be separated due to the sexual touching and aggressive behaviors towards each other. The boys were "fearful, hypervigilent kids who did not trust that they were going to be safe." M. blamed himself for their removal from their home and viewed himself as a "deeply unlovable, bad child." M. was depressed, and J. was more reactive and aggressive. Wilhelm observed that unless the boys are in a

safe home and learn to control their behavior and emotions, the long-term effects would be damaging. They will have attachment, aggression, and learning problems, and have poor self-esteem and peer relationships. Wilhelm felt that continuing contact between the boys and Calloway was not in the boys' best interest.

At the termination hearing, Calloway testified that she had done a "wonderful job" raising her boys and that her visits with the boys "went wonderful." Calloway denied telling Anderson that she drank six to twelve beers and denied exposing her boys to improper sexual behavior. Calloway claimed she had done everything the courts and social services asked her to do.

<u>Analysis</u>

When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." <u>Logan</u>, 13 Va. App. at 128, 409 S.E.2d at 463. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." <u>Farley v. Farley</u>, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990). "The trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." <u>Logan</u>, 13 Va. App. at 128, 409 S.E.2d at 463.

Code § 16.1-283(B) provides that a parent's parental rights of neglected or abused children may be terminated if the court finds by clear and convincing evidence that it is in the children's best interests and that (1) the neglect or abuse presented a substantial threat to the children's life, health, and development, and (2) it is unlikely that the conditions that resulted in the neglect or abuse can be substantially corrected or eliminated such that the children can return to their parent's care within a reasonable period of time. Proof that the parent, without good cause, has not responded or followed through with appropriate efforts by the various agencies designed to reduce, eliminate or prevent the neglect or abuse is prima facie evidence of these conditions. "[T]ermination of residual

parental rights is a grave, drastic, and irreversible action," <u>Helen W. v. Fairfax Count Dep't of Human Dev.</u>, 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), and we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements,'" <u>Logan</u>, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

LDSS proved by clear and convincing evidence that termination of Calloway's parental rights was in her boys' best interest. The evidence proved Calloway failed to keep appointments to have M.'s leg braces fitted, M.'s leg braces were severely outdated, and the boys were exposed to improper sexual behavior and domestic violence. This evidence supported the court's finding that they had been neglected and the neglect presented a serious and substantial threat to their health and development. The evidence also proved that Calloway had a mental deficiency and habitually abused intoxicating substances and that it is not reasonably likely that the conditions resulting in the neglect could be substantially corrected so that the boys can be returned to Calloway's care within a reasonable period of time. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." <u>Kaywood v. Halifax County Dep't of Soc. Servs.</u>, 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The record supports the trial court's finding that LDSS proved by clear and convincing evidence that Calloway's parental rights should be terminated pursuant to Code § 16.1-283(B) and that termination of Calloway's parental rights was in her children's best interests. Accordingly, we summarily affirm the judgment. <u>See</u> Rule 5A:27.

<u>Affirmed.</u>