COURT OF APPEALS OF VIRGINIA


Present:    Judges Kelsey, Petty and Senior Judge Bumgardner


DEBRA KAY TRUSLOW HARRIS, SOMETIMES KNOWN AS
  DEBORAH K. HARRIS

                                                    MEMORANDUM OPINION[*]
v.        Record No. 0784-06-3                          PER CURIAM
                                                      AUGUST 8, 2006
HARRISONBURG ROCKINGHAM
  SOCIAL SERVICES DISTRICT


                FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                              James V. Lane, Judge

            (John S. Hart, Jr.; Hart Law Offices, on brief), for appellant.

            (Kim Van Horn Gutterman, Assistant County Attorney; Danita S.
            Alt, Guardian *ad litem* for the minor child, on brief), for appellee.


        Deborah K. Harris appeals the trial court's decision terminating her parental rights to her

minor child, J.S., born on June 27, 1996.  Harris contends (1) the evidence was insufficient to

support the termination under Code § 16.1-283(B) and (C); and (2) the trial court erred by

emphasizing Harris's incarceration and lack of contact with the Harrisonburg Rockingham

Social Services District ("HRSS").  Upon reviewing the record and the briefs of the parties, we

conclude that this appeal is without merit.  Accordingly, we summarily affirm the decision of the

trial court.  See Rule 5A:27.

                                        Background

        We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

So viewed, the evidence proved that in February 2002, Harris asked Vita Morales to care for J.S. because Harris was unable to do so. Morales agreed and assumed custody of J.S. During the time that J.S. lived with Morales, the Valley Community Services Board (Valley CSB) provided intensive in-home services, outpatient services, psychiatric services, and crisis intervention to J.S. In May 2002, Child Protective Services issued a founded level 2 complaint of physical abuse against Harris due to her treatment of J.S., who was five years old at that time.[1]

In February 2003, Morales entrusted J.S. to the Waynesboro Department of Social Services ("WDSS"). On February 26, 2003, WDSS filed an initial foster care plan with a goal of placement with a relative. At that time, WDSS determined that the goal of returning J.S. home was not appropriate because Morales was not a blood relative and J.S. did not want to return to Morales's home, which was deemed unstable. Subsequently, WDSS suspended visitation between Morales and J.S. because J.S. acted out after those visitations.

On July 11, 2003, a foster care review occurred, which resulted in the continued goal of placement with a relative. At that time, WDSS was working with Harris because she did not have stable housing and evidence of substance abuse existed. WDSS provided various services to Harris, including assistance in obtaining housing, transportation to visitation, and referrals for services. WDSS knew at that time that there were problems in the relationship between J.S. and Harris and that Harris needed to improve her parenting skills and the manner in which she dealt with J.S.'s behavior. Harris eventually completed a psychiatric evaluation and a drug screen.

In January 2004, the Waynesboro Juvenile and Domestic Relations District Court (Waynesboro J&DR court) conducted a permanency planning hearing, and ordered that a new entrustment agreement be signed or J.S. be returned to Harris's custody. The Waynesboro J&DR

---

[1] Child Protective Services had also issued founded complaints of inadequate supervision and physical abuse against Harris with respect to her treatment of her son, G.T.

court ordered that Harris participate "with CSA in Rockingham County," that she remain drug free, and that she provide proper child care. At that time, in response to an offer from WDSS for continuing services, Harris indicated that "[s]he didn't want Social Services to have any further contact in her life." J.S. was returned to Harris's custody.

On January 23, 2004, Beth Lawler, the social work supervisor for HRSS, met with Harris, who had come to the agency. Harris was frustrated and told Lawler that she wanted to give up custody of J.S. Harris indicated that J.S. was "out of control," that she could not control J.S., and that "she didn't know what she was going to do with her." Harris did not want services, but instead, wanted J.S. out of her care that day. Harris requested a custody transfer for J.S. or for J.S. to be hospitalized or provided medication.

On January 30, 2004, Harris returned to HRSS, again requesting that J.S. be hospitalized because she couldn't manage her behavior. Harris told Lawler that she was a recovering crack cocaine addict and she was having trouble walking due to an injury. At that point, HRSS talked to Harris about services it could provide to help her, including an in-home worker.

On February 24, 2004, Harris and the in-home worker, John Jackson, came to HRSS. Harris reported that J.S. was "out of control." Harris wanted J.S. "screened" to see if she was eligible to be hospitalized on an involuntary detention order or temporary detention order on psychiatric grounds. While they waited in the parking lot for the police to arrive, Harris's frustration became apparent to J.S., who did things to aggravate Harris. Harris had little ability to manage J.S.'s behavior. At one point, when Harris was struggling to get J.S. back into the car, Harris yelled at J.S., "if you're going to fight with me you're going to fight like a woman." When the police arrived, Harris told J.S., "they're here to get you, they're here because of you," which caused J.S.'s behavior to escalate to the point that it took four police officers to subdue her and place her in handcuffs. J.S. was seven years old at that time.

On March 1, 2004, pursuant to a petition filed by HRSS, an emergency removal order was entered granting custody of J.S. to HRSS. According to Lawler, HRSS filed the petition because "there weren't any more services we could provide. . . . [W]hen we were consulting with professionals dealing with the family they were saying that it was the home environment that was causing [J.S.] to have the behaviors and the problems that she was having."

Melanie Hickman, a foster care social worker employed by HRSS, who was assigned J.S.'s case, met with Harris on March 17, 2004. Hickman talked to Harris about the services she needed to complete in order to regain custody of J.S.; however, Harris did not feel she needed any services. Harris disagreed with the professionals, who believed that J.S.'s environment was responsible for her problems and, instead, believed that J.S. suffered from bipolar disorder and needed medication. J.S. had been placed at Child Help East, but Harris refused to go there to participate in family therapy. Harris stated at one point that "if she has to go there someone is going to have to lock her up." On April 26, 2004, Harris did attend a family therapy session at Child Help. Hickman reported that Harris screamed at the therapist and walked out as J.S. walked in.

On May 19, 2004, a Foster Care Service Plan was approved, which required that Harris do the following in order to regain custody of J.S.: Obtain and maintain stable housing free from substance abuse, physical abuse, and emotional abuse for at least six months; obtain and maintain stable employment for at least six months providing verification of financial stability; participate and cooperate with individual counseling and family counseling and follow through on any recommendations resulting from that counseling; maintain consistent and appropriate telephone contact and visitation when deemed appropriate by J.S.'s therapist; cooperate with HRSS and other agencies providing services; participate in treatment planning for J.S.; complete a psychological evaluation with Dr. Joann Grayson and follow any recommendations from that evaluation; participate in a substance abuse evaluation and substance abuse programs provided for her;

complete random drug screens when required; complete a parenting class if deemed appropriate; follow all recommendations made by agencies working with her and J.S.; and participate in in-home services provided to her and J.S. when deemed appropriate.

On August 3, 2004, Harris told Hickman that she had already done individual counseling and in-home services in the past. On July 14, 2005, after Harris was released from jail, she met with Hickman. Harris told Hickman that she was getting a job at a hotel in Waynesboro. Hickman asked Harris to take a form with her to that job for verification, but Harris refused. According to Hickman, between March 2004 and August 5, 2005, Harris did not maintain consistent employment for a period of six months or more.

With respect to housing, at the time J.S. came into HRSS's custody, Harris and J.S. were living at the Red Carpet Inn. After that, Harris stayed with a friend named Crystal, and then on March 17, 2004, reported that she was living with another friend and that she was planning to move to Chesapeake. On April 27, 2004, Harris told Hickman she was living with her son, Greg. On August 3, 2004, Harris told Hickman she did not have an address but that she was using her daughter's address in Waynesboro. On November 10, 2004, Harris reported that, on November 1, 2004, she moved into a new apartment located in Waynesboro. Then Harris was incarcerated for six months from December 2004 through June 7, 2005. Harris reported that upon her release from jail, she was living with Morales, which Hickman indicated was not an appropriate home for J.S. to be returned to as Harris had previously reported that there had been "drugs in and out of [that] home."

With respect to visitation, Hickman testified that Harris did not maintain consistent visitation with J.S. On one visit in April 2004, Harris asked J.S. to choose between Child Help and home, and J.S. chose Child Help. At that point, Harris yelled and stormed out. In August 2004, J.S. was moved to a foster home in the local area. HRSS initially tried to set up visitation for Harris

with J.S. at the agency, but Harris stated that she could not attend visitation in Harrisonburg due to her work schedule and the agency's hours, so they arranged for visitation at the People Places office in Staunton on a more flexible schedule. However, on August 19, 2004, Harris told Hickman that she could not miss work to visit J.S. In September 2004, when Harris visited J.S. in Staunton, Harris "would go on tangents and . . . [J.S.] would actually redirect her. [Harris] brought up going to jail and the possibility of [J.S.] being adopted." People Places made accommodations so that Harris could visit J.S. after work hours; however, Harris arranged for visits with J.S. only three times between August 2004 and December 2004. In addition, Harris missed one of those visits. In August 2004, Harris told Hickman that she had "overdosed twice because of the stress that she was having."

On November 19, 2004, a foster care review hearing took place in the Rockingham Juvenile and Domestic Relations District Court (Rockingham J&DR court). HRSS recommended that no further visitation occur until Harris completed a substance abuse evaluation and treatment if needed.[2] In April 2005, the Rockingham J&DR court approved the goal of adoption for J.S. and HRSS filed a petition seeking to terminate Harris's residual parental rights to J.S.

Although Hickman had discussed with Harris before the November 19, 2004 hearing the necessity of her undergoing substance abuse evaluation and necessary treatment and the court ordered that she do so, Harris did not contact Hickman to set up the evaluation after the hearing, nor did Harris contact Hickman after she was released from incarceration in June 2005. It was not until July 8, 2005, that Harris discussed the substance abuse evaluation and treatment requirement with Hickman. Harris indicated that she did not need to undergo those requirements because she took a class related to drugs in jail, but then reported that she had overdosed in June 2005. On July 14,

_____

[2] A petition seeking custody of J.S. filed earlier by Morales was dismissed on November 19, 2004.

2005, Hickman met with Harris again and discussed the necessity of her undergoing a substance abuse evaluation. At that time, Harris reported that she had talked to Paul Harman at the Valley CSB and he told her she could not do the evaluation due to the medication she was taking. When Hickman talked to Harman, he stated that they could do a substance abuse evaluation and make recommendations. Hickman told Harris what she had learned from Harman.

With respect to the psychological evaluation, Hickman referred Harris to Joann Grayson, Ph.D., a clinical psychologist, in the summer of 2004, and again talked with Harris on August 3, 2004 about the requirement of obtaining the psychological evaluation. Although Harris told Hickman she had undergone a psychological evaluation three months before that, Harris never provided a report to Hickman for an evaluation during that time period. On November 10, 2004, Harris reported to Hickman that she'd already done a psychological evaluation, but eventually agreed to do one as long as it was after 5:30 p.m. Hickman again gave Harris Grayson's contact information. On July 8, 2005, Hickman again spoke with Harris about the necessity of a psychological evaluation and gave her Grayson's number. Harris finally made an appointment with Grayson for July 18, 2005, and then for July 26, 2005, but she did not show up for that appointment. Harris told Hickman she did not show up because she was moving and lost her appointment card.

As of August 5, 2005, Harris had not visited J.S. since December 1, 2004, a period of eight months. Harris had not meaningfully and consistently participated in family therapy with J.S. or individual therapy. Between the time J.S. came into HRSS's custody in March 2004 and when Hickman stopped working on J.S.'s case in August 2005, Harris had reported living in eight different locations. Harris reported to Hickman that she had attempted suicide twice. Harris only submitted to one drug screen for HRSS on May 6, 2004, which was negative. Harris did not obtain the drug screen ordered by the court on May 19, 2004. On that day, Harris told Hickman she was going to get her license and she would be back to take the test, but she did not return or take the test.

On July 25, 2005, Alexis Morehouse was officially assigned to J.S.'s case. Morehouse met with Harris in July after she was released from jail. Harris did not undergo the substance abuse evaluation until October 6, 2005. Morehouse received that report on October 6, 2005, five days prior to the October 11, 2005 termination hearing. The evaluation indicated that Harris reported she had provided HRSS with at least five clean urine samples in the past four months, yet Morehouse indicated that since she took over the case on July 25, 2005, Harris had not provided any samples. The evaluation indicated that Harris has a high probability of having a substance abuse dependence disorder, and recommended individual therapy and that she obtain other services to address her biopsychosocial problems.

At the time of the October 11, 2005 termination hearing, Harris had not provided Morehouse with any housing or employment verification. Since Morehouse took over J.S.'s case in July 2005, Harris had not had any visitation or contact with J.S., although Morehouse learned that J.S.'s sister had been facilitating communication between J.S. and Harris, which was not allowed or approved by HRSS. After J.S. learned that Harris's parental rights had been terminated in the Rockingham J&DR court, her demeanor improved. She was excited and asked Morehouse when she would be able to meet her adoptive parents and when she could be adopted. J.S. was to be discharged from the Bridges Treatment Center in December 2005. She had resided there since January 2005.

Janice Stinson, J.S.'s therapist at the treatment center, reported that she had seen changes in J.S. over time. J.S. had become significantly less aggressive in her behavior, more respectful, and improved her interpersonal relationships with peers. While J.S. still reacted strongly to emotional stimuli, she did not do so in a physical manner as she had in the past. J.S.'s current diagnosis is Post Traumatic Stress Disorder, with rule-outs for mood disorder, anxiety disorder, reactive attachment

disorder, and ADHD. J.S. did not meet the criteria for a diagnosis of bipolar disorder. J.S. did not talk about Harris during the approximately eleven months that Stinson had treated her.

Harris testified that she had been living with Morales since she got out of jail in June 2005. Harris contended she planned to move into an apartment on November 1, 2005. Harris stated that she has been working for approximately one year for Fairfield Construction. She works about fifty-six hours per week and is paid $10.50 per hour. She has medical, dental, and vision insurance, to which she has added J.S. as an insured. She confirmed that she completed the substance abuse evaluation. She claimed the delay in completing that evaluation was due to her car breaking down, getting the appointment time confused, and a problem with confirming who was going to pay for the evaluation. Harris asserted that she is willing to continue with individual counseling with Jack Belcher, who completed the substance abuse evaluation. She also stated that she had undergone a psychological evaluation by Grayson, but admitted "[i]t took me a while" to complete that evaluation. Harris admitted she had made many mistakes over time, including getting into an abusive relationship and allowing herself to get addicted to drugs. She admitted she attempted suicide since she left jail in June 2005, attributing that attempt to "the pressure from Social Services" and "all the court stuff going on with [J.S.]." Harris admitted she neglected her children in the past, but denied ever beating them. She asserted that "people have come in here, they have told lies on me, they have said things that's not true." She claimed she would do whatever she had to do to get J.S. back and "to make things right." She acknowledged that J.S. should not come back to her immediately, but that she wanted her visitation rights restored and for her and J.S. to attend counseling together, and "then gradually bring her back into the home." Harris admitted she would need services in order to care for J.S. Harris said she had not used drugs for two years, indicating that the drug overdoses she had in the past eighteen months involved prescription drugs. Harris

acknowledged that she was diagnosed as bipolar and manic depressive in 1998 or 1999, but that she was not currently under medical care or medication for those conditions.

The Psychological and Parenting Evaluation of Harris completed by Grayson reflected that Grayson had contact with Harris on July 18, 2005, August 3, 2005 and September 9, 2005. Grayson indicated that Harris's depression and recent suicide attempts were of considerable concern and that Harris had little support and was not engaged in any counseling, therapy, or support group. Grayson reported that Harris appeared "emotionally fragile" and unstable, that she had two recent hospitalizations due to suicide attempts, and her current level of depression was significant. Grayson noted that Harris was working, but did not have stable housing. Grayson indicated that Harris was taking psychotropic medication, but not seeing a counselor. Grayson opined that the "[r]isk for relapse and use of substances is very high." Grayson further opined that Harris's parenting skills "are very limited," indicating that "at times her strategies appear ineffective and counter-productive." Grayson noted that Harris "appears to grant a great deal of autonomy to children while expecting little of them in return." Grayson recommended that Harris have follow-up care with a highly qualified therapist, continue to take medication, undergo regular drug testing, be provided assistance with financial planning, obtain adequate housing, and be provided intensive in-home services if J.S. were returned to her.

Analysis

"[T]ermination of residual parental rights is a grave, drastic, and irreversible action." Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991). When considering termination of a parent's residual parental rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's

- 10 -

best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990). "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (citation omitted).

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of Harris's residual parental rights to her child, J.S., under subsections (B) and (C)(2) of Code § 16.1-283.

Code § 16.1-283(B) requires proof, by clear and convincing evidence that "[t]he neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development" and "[i]t is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time."

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence that (a) the termination is in the best interests of the child, (b) "reasonable and appropriate" services have been offered to help the parent "remedy substantially the conditions which led to or required continuation of the child's foster care placement," and, (c) despite those services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care."

Based on our review of the record, we conclude that the trial court's decision finding that there was clear and convincing evidence to support termination of Harris's parental rights to J.S. as being in her best interests was not plainly wrong or without evidence to support it. Credible evidence in the record supports the trial court's findings that the neglect and abuse suffered by J.S. presented a substantial threat to her life, health, and development and that Harris failed to

- 11 -

substantially remedy the conditions that resulted in the removal of J.S. from her care and custody and her placement with HRSS and foster care, within a reasonable amount of time not to exceed twelve months, despite being offered various services by and through HRSS.

Harris had physically abused J.S. and turned her over to Morales because she was unable to care for her in February 2002. Harris suffers from long-standing substance abuse and mental health issues, which she has never adequately addressed through counseling. Harris failed to obtain and maintain stable housing and maintain consistent visitation with J.S. When Harris did visit J.S., she acted inappropriately. In early 2004, very shortly after Harris regained custody of J.S., she was unable to parent J.S., wanted to have her hospitalized, and verbally abused her in the presence of others. Harris consistently maintained that the problem was with J.S. and not the home environment, contrary to the opinions of various professionals. Although Harris was first referred to Grayson for a psychological evaluation in the summer of 2004, that evaluation did not commence until July 2005, sixteen months after custody of J.S. was granted to HRSS. Thus, HRSS did not receive the completed report until after the first termination hearing in the trial court. That report indicated that Harris's parenting skills were inadequate, that she suffered from unaddressed mental health issues, that she was prone to suicide attempts, and that she had a high probability of relapsing into substance abuse. J.S.'s behavior, on the other hand, had improved greatly after HRSS assumed custody in March 2004, and she was excited and looking forward to being adopted. As of the termination hearing, Harris had not visited J.S. in ten months due to her failure to obtain a substance abuse evaluation. "The [termination] statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (quoting Code § 16.1-283(C)(2)). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out

when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Soc. Serv., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

We find no support in the record for Harris's argument that the trial court emphasized her incarceration and lack of contact with HRSS over the remaining overwhelming evidence in the record, which supports its decision.

The record supports the trial court's finding that HRSS presented clear and convincing evidence satisfying the statutory requirements of Code § 16.1-283(B) and (C)(2) and establishing that the termination of Harris's residual parental rights was in J.S.'s best interest.

Accordingly, we summarily affirm the trial court's decision.

Affirmed.