COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Elder and Humphreys
Argued at Richmond, Virginia

MENDEL TYSON

v.        Record No. 1687-11-1

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

DANIELLE KINTNER-TYSON

v.        Record Nos. 2005-11-1

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

DANIELLE KINTNER-TYSON

v.        Record Nos. 2006-11-1

CITY OF VIRGINIA BEACH                    MEMORANDUM OPINION[*] BY
  DEPARTMENT OF HUMAN SERVICES               JUDGE LARRY G. ELDER
                                              MARCH 20, 2012
DANIELLE KINTNER-TYSON

v.        Record Nos. 2007-11-1

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

DANIELLE KINTNER-TYSON

v.        Record Nos. 2008-11-1

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

DANIELLE KINTNER-TYSON

v.        Record Nos. 2009-11-1

CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Patricia L. West, Judge

Richard Leland for appellant Mendel Tyson.

Mykell Messman (Joseph W. Hood, Jr. & Associates, on brief), for
appellant Danielle Kintner-Tyson.

Rachel Allen, Associate City Attorney (Mark D. Stiles; Christopher
Boynton; Carla Kithcart, Guardian *ad litem* for the infant children;
Office of the City Attorney, on briefs), for appellee.

In these related cases,[1] Mendel Tyson (father) and Danielle Kintner-Tyson (mother) appeal from decisions terminating their residual parental rights to their daughters[2] under Code § 16.1-283(C)(2). On appeal, father and mother (the parents) contend the terminations were erroneous because the City of Virginia Beach Department of Human Services (DHS) (1) violated the statute by removing the children without good cause and (2) failed to prove by clear and convincing evidence both (a) that the termination was in the best interests of the children and (b) that the parents failed to make substantial progress toward remedying the conditions that led to or required the continuation of the children's foster care placement. Viewing the evidence in the light most favorable to the party prevailing below, as required by the applicable standard of review, we hold no reversible error occurred. Thus, we affirm the termination of father's and mother's parental rights to C., M., S., and R. and, additionally, mother's parental rights to E.

---

[1] We consolidate these appeals, which share an appendix and include virtually identical assignments of error, for purposes of decision only.

[2] Mother's rights to her five daughters, whose names are hereinafter abbreviated E., C., M., S., and R., were terminated. Only four of those five children, C., M., S., and R., were father's biological children. His rights to all four of those children were terminated. The parental rights of the biological father of E. are not at issue in this appeal.

I.

## A.  ENDING OF THE TRIAL HOME PLACEMENT IN JANUARY 2006

Father and mother contend DHS improperly removed the children from their home without good cause in January 2006.

The preliminary removal of the children from father's and mother's custody occurred in March 2004, pursuant to Code § 16.1-252, for abuse or neglect.  As a result of that removal, DHS obtained legal custody of the children.  "Legal custody," as defined by the relevant statutes,

> vests in a custodian the right to have physical custody of the child,
> to determine and redetermine where and with whom he shall live,
> the right and duty to protect, train and discipline him and to
> provide him with food, shelter, education and ordinary medical
> care.[3]

Code § 16.1-228 (footnote added); see Code § 16.1-252.

Father and mother do not contest the basis for the 2004 removal in this appeal, and thus, we do not consider it.  What they appear to contest is the basis for what they refer to as the 2006 removal.  However, as counsel for DHS points out, the children were in father's and mother's home from August 2005 to January 2006 pursuant to a trial home placement, implemented when DHS was unable to find any suitable relatives able to care for the children and the parents appeared to be complying with their foster care service plans.  During that time, DHS retained legal custody and, along with that custody, its responsibility for the girls' health and safety.  Thus, when it ended the girls' trial home placement in January 2006, it was not required to prove abuse and neglect rising to Code § 16.1-252 standards.

---

[3] The statute states that legal custody is "subject to any residual parental rights and responsibilities," which the statute further defines as "all rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, including but not limited to the right of visitation, consent to adoption, the right to determine religious affiliation and the responsibility for support."  Code § 16.1-228.

Further, the record establishes that when DHS ended the trial home placement, it did so because it was concerned about the girls' health. It was not required to prove that the parents' behavior rose to the level of medical neglect or abuse in order to justify doing so. Because DHS retained legal custody of the children during the trial home placement, it was legally justified in ending that placement when it learned several of the girls required immediate medical care for lingering upper respiratory infections and father's only action when DHS expressed concern was to schedule medical appointments for them for two weeks later. DHS also knew at that time that all five girls were acting out sexually and that the youngest child was exhibiting numerous significant non-sexual behavioral problems, as well. After DHS had ended the trial home placement, DHS added to its basis the information that father and mother were failing to comply with the service plan and that father had also admitted using cocaine. Any inconsistencies in rationale and stated goals among the service plans is not fatal to DHS's efforts to terminate father's and mother's parental rights. The evidence supports a finding that DHS's decision to end the trial home placement was justified under the circumstances of this case.

Although parents complain it was not possible for them to maintain and strengthen the parent-child bond under these circumstances, the termination of their parental rights was not based on any failure to maintain or strengthen the parent-child bond. It was based, instead, as discussed below, on their failure to complete individual counseling and other therapy required to improve their respective abilities to parent their children safely.

B. SUFFICIENCY OF THE EVIDENCE TO JUSTIFY TERMINATION

"Code § 16.1-283 embodies the statutory scheme for the termination of residual parental rights in this Commonwealth." Lecky v. Reed, 20 Va. App. 306, 311, 456 S.E.2d 538, 540 (1995). Subsection (C)(2), the subsection under which the trial court terminated appellants' parental rights in this case, requires proof, by clear and convincing evidence, (1) that the

termination is in the best interests of the child, (2) that "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child[ren]'s foster care placement," and (3) that, despite those services, the parent has failed, "without good cause," to remedy those conditions. Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." Gifford v. Dennis, 230 Va. 193, 198 n.1, 353 S.E.2d 371, 373 n.1 (1985).

We view the evidence in the light most favorable to the party prevailing below and grant to that evidence all reasonable inferences fairly deducible therefrom. Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). We are mindful of the principle that "[t]he termination of residual parental rights is a grave, drastic and irreversible action," Helen W. v. Fairfax Cnty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991), but we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements,'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)).

The evidence in the record, viewed in the light most favorable to DHS, proved by clear and convincing evidence that the parents failed, without good cause, to remedy the conditions that led to or required the continuation of the children's foster care placement. It proved, in addition, that the termination was in the best interests of each of the children.[4] As the trial court observed, father and mother complied with the more "concrete finite requirements such as parenting classes, anger management, that type of thing"; however, they had not done "the heavy lifting" by fully participating in their own individual counseling to develop "insight into their

---

[4] Parents do not contend that DHS failed to offer them "reasonable and appropriate" services, and the record is replete with evidence that DHS did, in fact, offer appropriate services. Thus, we do not consider this prong of the statute.

[own] issues," which was necessary to permit them to deal with their children's issues. The evidence established that father and mother had both failed to complete individual therapy despite opportunities to do so in both 2006 and 2008. The evidence further established that both parents specifically stated they would not comply because they did not think they needed therapy.

Both parents also failed to comply with additional treatment required by their service plans. It was undisputed that mother was sexually molested by her stepbrother for two years as a pre-teen and teenager. Mother had been directed to participate in a program for adults who had been molested as children (AMAC), but she categorically refused to do so. Also, mother admitted how difficult it had been for her as a teenager when her father and stepmother refused to acknowledge the abuse, and yet she refused to acknowledge any possible truth to C.'s allegations that C. had been molested by a family friend while in her parents' care. Finally, mother's service plan required her to be evaluated for depression and comply with the evaluator's recommendation that she take an anti-depressant. She refused to comply with this directive, contending the medication was too expensive, but she failed to follow DHS's suggestion that she ask her doctor to substitute a less expensive generic medication.

Father similarly refused to participate in additional treatment required by his service plan. A required psychosexual evaluation of father performed in 2006 revealed a generalized "sexual impulse control problem," and he was directed to undergo sex offender treatment and twice-yearly polygraph examinations to confirm his success in controlling his inappropriate sexual impulses. The evaluator, Dr. Stephen Ganderson, also recommended that father avoid alcohol and other substances that could negatively impact his impulse control. Despite these recommendations, father admitted he used cocaine periodically for the next several years and admitted his physicians said he was at risk for addiction. Despite the fact that participation in

substance abuse treatment was added to father's service plan, he failed, as well, to obtain that treatment.

Even after the court refused to terminate father's and mother's parental rights in 2008, opining they had not received clear enough guidance about their individual therapy requirements prior to that time, father and mother attended only initial therapy intake appointments later in 2008. Although DHS arranged to pay for the therapy and provide transportation as necessary, the parents once again failed to participate in any individual therapy or any of the specialized sexual and substance abuse treatment previously ordered; once again, the parents stated they did not think they needed such therapy. At that time, the children had been in the legal custody of DHS for about four years, since 2004. After that 2008 ruling, the children were in DHS's custody for an additional three years before the court granted the petitions to terminate parental rights in 2011. This seven-year period, during which DHS spoke with the parents repeatedly about what they needed to do to regain custody, provided them with more than enough time to attempt "to remedy substantially the conditions which led to or required the continuation of the child[ren]'s foster care placement[s]," but they failed to do so.

Additional evidence established that termination of father's and mother's parental rights to the girls was in the best interest of each of the girls, all of whom have some degree of special needs. Both parents present a risk of physical or sexual abuse to the girls. The girls originally came into care because mother had beaten C. severely enough to leave belt or loop marks on her arms, back, and legs. Although mother attended parenting and anger management classes, she failed to complete individual therapy or take medication for her depression as required by her service plan. Once the girls entered DHS's custody, it was learned that father had sexual impulse control and drug abuse issues, and he, too, failed to obtain the required treatment for those conditions.

- 7 -

Ms. Rosenbaum, the social worker who observed the parents during years of visitation, stated that the parents sometimes had "conflicts" with each other during the visitations. The conflicts visibly disturbed the children, but when Rosenbaum asked one of the children if the conflict bothered them, she said, "Well, that's what we're used to. That's nothing new." Rosenbaum also reported the visitations were often "chaotic" and that many other things took place in the visitations which led her to question whether "anything . . . was learned in the parenting classes . . . because there [were] just a lot of common sense things that weren't happening."

Additional evidence shows the two youngest children, R. and S., both have difficulty distinguishing between fantasy and reality, making it difficult for them to protect themselves, and both will require long-term services. R., in addition, has problems with physical aggression which escalated primarily after visits with her parents. R. had required three inpatient psychiatric hospitalizations as a result of her aggression, but after visitations with her parents were stopped on the recommendation of her therapist, she had not required any additional hospitalizations. S., although she generally had a sweet disposition, displayed aggression in therapy toward a puppet she named "mother." Again, when visitation with her parents stopped upon her therapist's recommendation, S.'s aggression toward the "mother" puppet also ceased.

M., the middle child who was eleven at the time of the termination proceedings, was described as the best adjusted of the three youngest girls and has minimal memories of her parents. Her therapist determined she has no attachment to them and that no bonding was occurring between her and her parents during visitation. As a result, her therapist was unable to articulate any clinical benefit for her to continue visitation with them. M. has bonded well with her foster mother, does not wish to return home, and is excited about the prospect of being adopted.

The evidence concerning C., viewed in the light most favorable to DHS, is that she was sexually molested by a family friend and that father and mother refuse to acknowledge he could have committed such an act. Although C., who was fourteen at the time of the termination proceeding, loves her parents and is ambivalent about being adopted, her therapist expressed concern about their ability to protect her since they refuse to acknowledge that she had been abused. C.'s therapist also indicated she may require intermittent ongoing therapy as a result of her abuse, a need her parents are unlikely to support since they deny any abuse occurred.

Finally, E., the oldest child, daughter of mother and a different father, was seventeen at the time of the termination proceeding. Diagnosed as mildly mentally retarded, E. also has memory problems, functions at the level of a nine to twelve year old, likely will not progress past that age, and will be unable to live independently. She is vulnerable to being taken advantage of by men and, thus, any long term caregiver "would have to be really vigilant over her." Further she was often ignored by mother and father, her stepfather, during visitation. E.'s therapist noted that a depressed parent would be at risk of not having enough energy to "attend to" her child, and the therapist mentioned what appeared to her to be mother's lack of empathy toward E. E.'s therapist has opined that E. should not be returned to mother's and father's care.

This evidence, viewed in the light most favorable to the City, is sufficient to support a finding that the termination of father's and mother's respective parental rights to the children is in the best interest of each of the five girls.

## II.

For these reasons, we hold the trial court did not err. Thus, we affirm the involuntary termination of father's and mother's parental rights to C., M., S., and R. and, additionally, mother's parental rights to E.

<u>Affirmed.</u>