UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges AtLee, Malveaux and Senior Judge Annunziata
Argued at Fredericksburg, Virginia


DAVID DUANE DAVIS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 2074-16-4              JUDGE MARY BENNETT MALVEAUX
                                                         AUGUST 22, 2017
STAFFORD COUNTY
  DEPARTMENT OF SOCIAL SERVICES


                    FROM THE CIRCUIT COURT OF STAFFORD COUNTY
                                  Charles S. Sharp, Judge

               Gary D. Godman (Law Office of Gary D. Godman, on brief), for
               appellant.

               Catherine M. Saller (Jean M. Kelly, Guardian *ad litem* for the
               minor children; Law Office of Catherine M. Saller, PC, on brief),
               for appellee.


        The Circuit Court of Stafford County ("circuit court") entered orders terminating the

residual parental rights of David Duane Davis ("father") to his three children, pursuant to Code

§ 16.1-283(C)(2).  Father argues that the circuit court erred in entering these orders because the

Stafford County Department of Social Services ("DSS" or "the department") failed to meet its

statutory obligation to investigate placing his children with their direct family members.  He

alternatively argues that the evidence did not support the trial court's finding that terminating his

parental rights was in his children's best interests.  We disagree with father on both assignments of

error and, consequently, we affirm.


_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND

We review the evidence in the light most favorable to DSS, which prevailed below, drawing all reasonable inferences in its favor. See Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 40, 764 S.E.2d 284, 287 (2014).

Father and Sarah Swartwood-Davis ("mother") have three children together. Their five-year-old twin daughters, A. and E., were born in September 2011. Their four-year-old son, I., was born in May 2013. Mother also has a nine-year-old son, J., from another relationship.

Each child has behavioral or medical issues. A. is prone to tantrums and oppositional behavior. E. suffers from Turner Syndrome, and will need to see specialists throughout her life to address her medical needs. I., meanwhile, displays more anger and aggression than is typical in a toddler his age.

Mother and father separated shortly before I.'s birth. Father testified that he cannot remember why he and mother originally separated due to a traumatic brain injury that has impaired his memory.

Father explained that in June 2012, an angry former employee hit him in the back of the head with a forty-pound bar, fracturing his skull and causing bleeding inside his brain. According to father, this injury has impaired his ability to reason. Others have told him that the injury may cause him to be violent. Father himself acknowledged that he has a "temper," and notes from his initial meeting with DSS staff indicate he reported that the injury had caused him to develop "uncontrolled anger." He also said the injury "erased" some of his memories.

Consequently, father could not recall whether he and mother separated due to physical or verbal abuse. The children resided with mother after the separation.

In 2012 the Stafford County Child Protective Services ("CPS") received the first of six child abuse complaints relating to the children. The basis of this first complaint was that mother

had hit, kicked, and screamed at J. while at a doctor's office. In September 2013, while the case was still open, CPS received another complaint indicating that A. had fallen out of a second-story window after mother left her and two of her siblings unattended.

According to Karen Clark, a supervisor at CPS, the agency offered mother a number of services and referrals; however, the agency saw no improvement in her ability or desire to provide appropriate care for her children. CPS eventually filed Child in Need of Services petitions in May 2014 after sheriff's deputies learned that A. and E. were playing in the street while mother slept. Clark explained that CPS filed the petition because the agency "needed court intervention to order services for the family."

Nevertheless, CPS continued receiving complaints indicating that the children were being abused or neglected. In September 2014, someone reported that mother's boyfriend had spanked A., who had bruises on her buttocks. In March 2015, CPS learned that both A. and E. had serious dental issues, including teeth that had decayed to a dangerous degree and abscesses that had gone untreated for years. And in April 2015, someone called CPS to report that mother was yelling and screaming at her children, who were living in a home not fit for their habitation. When CPS responded to this last call, they found that J. was not at home, and mother could not account for his whereabouts. CPS determined that this call was a founded complaint of abuse and neglect.

At CPS's encouragement, mother temporarily placed her sons in their maternal grandmother's care and placed her daughters with their maternal great-grandmother. In May 2015, a judge awarded the grandmother and great-grandmother custody of the children.

Father testified that he was not living with mother or their children during much of this period. Nothing in the record suggests that he made an effort to engage with or co-parent the children after the separation until their guardian *ad litem* first contacted him about the September

2014 incident involving A.'s bruises. He testified that he subsequently began visiting with his daughters in April—presumably April 2015. He also testified that he began visiting with I. and J. that June.

At some point after the children were placed with mother's relatives, however, father and mother resumed living together. They married in June 2015.

In July 2015, the children entered foster care after their maternal grandmother and great-grandmother began expressing doubts about their ability to continue caring for them. The Juvenile and Domestic Relations Court of Stafford County ("J&DR court") entered emergency removal orders awarding custody of the four children to DSS. In September 2015, DSS filed foster care service plans for the four children with a specified goal of returning the children to their parents.

In March 2016, DSS learned that father had been arrested for assault and battery against mother. At that point, mother told DSS that the marriage had been a sham, reporting that father had physically and verbally abused her on several occasions since the previous November. She told a psychologist during a mental health evaluation that father had given her "countless black eyes" and had induced two miscarriages through physical abuse.

Father was incarcerated from that point onward and had no further contact with his children. He expected to be released in January 2017.

In July 2016, DSS filed new foster care service plans that amended each child's permanency planning goal to adoption. The following month, the J&DR court entered new permanency planning orders as well as orders terminating father's residual parental rights to each of his three children. Father appealed each of these orders to the circuit court.

In the circuit court, Devonne Johnson, a DSS case worker, testified that DSS searched for other relatives with whom they might place the children but was unable to find anyone

appropriate. Referring to their maternal grandmother and great-grandmother, he explained that DSS did not consider placing the children with relatives as an alternative to adoption because "[t]he children had been [placed] previously with relatives and that was unsuccessful." Notes introduced into evidence indicate that they also spoke with John Davis, father's cousin, learning that he works twelve-hour shifts from 3:00 a.m. to 3:00 p.m. at his job driving heavy equipment.

Father made a motion to strike at the close of DSS's case-in-chief, arguing both that DSS had failed to introduce evidence that termination of his parental rights was in his children's best interests and that DSS never provided evidence that they considered placement with other relatives. The court denied the motion.

After DSS presented its evidence, mother testified that the department had made "several requests for a list of relatives." Although she did not know if father provided such a list, she testified they both had been asked for that information.

Father also acknowledged that DSS had asked him to provide a list of family members and testified he told the department about several relatives, including a younger brother with whom he had relatively no contact during the three preceeding years.[1] He claimed at the termination hearing that DSS never contacted this brother, whom he said had "insinuated that he would like to help out if he can." He admitted, however, that when DSS asked about his relatives, he told them that his younger brother "didn't know if he could help us or not."

When asked if he had provided his brother's "name, address, and telephone number to the Department of Social Services," father answered, "I have not been able to do that."

Father renewed his motion to strike at the close of the evidence, arguing only that DSS failed to meet its burden of proof regarding the children's best interest. During his closing

---

[1] According to father, his other relatives either were deceased or had told him that they were unwilling to assume custody of his children by the time of the termination hearing.

argument, he also asked the court to order DSS to consider placing the children with his relatives before terminating his parental rights.

The circuit court denied the renewed motion to strike and ruled in DSS's favor. Finding both that father had failed to remedy the circumstances that led to his children's placement in foster care and that termination of his parental rights was in his children's best interests, the court terminated those rights pursuant to Code § 16.1-283(C)(2).[2] Father objected to each of these orders, noting on the termination orders his belief that DSS had failed to carry its burden of proof under Code § 16.1-283(C).

## II. ANALYSIS

### A. DSS's Duty to Investigate

In his first assignment of error, father argues that the circuit court terminated his rights prematurely because the evidence did not prove that DSS had investigated placing his children with his relatives.

Code § 16.1-283(A) contemplates that every termination order will be accompanied by an order granting custody of the child to another person or agency. See Hawthorne v. Smyth Cty. Dep't of Soc. Servs., 33 Va. App. 130, 137, 531 S.E.2d 639, 643 (2000) (noting that the statute requires two concurrent orders). Before entering this custody order, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code

---

[2] In the same proceeding, the court terminated mother's residual parental rights to all four children. She appealed only the termination order that related to J., however, and is therefore not a party to this appeal.

§ 16.1-283(A).[3]  To facilitate this obligation, "the agency seeking termination has an affirmative duty to investigate all reasonable options for placement with immediate relatives." Sauer v. Franklin Cty. Dep't of Soc. Servs., 18 Va. App. 769, 771, 446 S.E.2d 640, 641 (1994).  The agency bears the "burden to show that no reasonable alternatives [for the court to consider] exist." Id.

Usually, the agency must contact a family member through one of its agents to fulfill this implied statutory duty.  In Hawthorne, we concluded that "DSS complied with the statutory requirements . . . when . . . a foster care worker for DSS, contacted [a relative] . . . to determine whether [the child] could be placed in [the relative's] care." 33 Va. App. at 138-39, 531 S.E.2d at 643.  The agency then presented evidence indicating that the relative had said initially that her home was too crowded and later agreed to take custody of the child only if the appellant paid child support. Id. at 139, 531 S.E.2d at 643-44.

We do not believe DSS violates its duty, however, when the department fails to contact relatives they cannot reasonably be expected to find.  In this case, father and mother both testified that DSS asked father about his relatives at least once.  Father's testimony establishes that he told DSS about his younger brother.  But when asked if he had provided DSS with the sibling's name, address, or telephone number, father admitted that he "ha[d] not been able to do that."  Viewing his answer in the light most favorable to DSS, we must presume that father never provided the department with any of that information—not even his brother's name.  And father has not explained how DSS reasonably could have been expected to locate his brother without this basic information.

---

[3] Whether the court actually awards custody of the child to a relative, however, depends upon certain required findings of fact. See Code § 16.1-283(A1) (providing that such orders "shall be entered only upon a finding" of four enumerated facts).  The court cannot transfer a child into her relative's custody upon termination of her parent's residual parental rights unless it expressly finds each of the enumerated facts "based upon a preponderance of the evidence" and memorializes those findings in its custody order. Id.

We conclude that DSS did not fail in its duty to investigate the brother's suitability as a custodian for father's children because they lacked the information they needed to contact him.

## B.  Best Interests

Father also argues that the circuit court erred in finding by clear and convincing evidence that terminating his residual parental rights was in his children's best interests.[4]  We disagree.

This Court traditionally has acknowledged that termination of parental rights "is a 'grave, drastic and irreversible action.'"  Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 44, 764 S.E.2d 284, 289 (2014) (quoting Helen W. v. Fairfax Cty. Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991)).  Nevertheless, we also must "presume that the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's [or children's] best interests.'"  Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 400, 719 S.E.2d 329, 341 (2012) (alteration in original) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)).  Consequently, "[w]here, as here, the court hears the evidence *ore tenus*, its finding is entitled to the same weight accorded to a jury verdict, and it will not be disturbed on appeal unless it is plainly wrong or without evidence to support it."  Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

"This Court has said that 'there is no simple, mechanical, "cut and dried" way' to apply the best interest of the child standard."  Welch, 64 Va. App. at 48, 764 S.E.2d at 291 (quoting Peble v. Peble, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).  Rather, the trial court must

_____

    [4] Code § 16.1-283(C)(2), the subsection under which father's parental rights were terminated, also requires the court to find that a parent failed to remedy substantially the conditions that led to his children's placement in foster care within a period no longer than twelve months; however, father has not assigned error to that particular finding.  Indeed, he expressly "concede[d] that he was unable to remedy the conditions leading to the children's placement in foster care before the twelve-month deadline."  We therefore do not address that portion of the circuit court's ruling.

determine a child's best interests after considering a number of factors in light of the specific facts of the case. See id. Those factors include

> the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Id. (quoting Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 161, 590 S.E.2d 575, 581-82 (2004)).

Father relies on some of these same factors, arguing on brief that he "had an ongoing, positive relationship with the children throughout the foster care process before his incarceration." But his argument omits many other factors.

For instance, father does not consider "the physical and mental condition of the . . . children," Harrison, 42 Va. App. at 161, 590 S.E.2d at 582, a factor discussed extensively by the court below. As the circuit court noted, each of father's three children has special medical or emotional needs. A. is prone to tantrums and oppositional behavior. E. suffers from an incurable medical condition that will require significant, life-long treatment. And I. already displays more anger and aggression than is typical for a child his age.

Father, meanwhile, admitted having his own mental difficulties stemming from the traumatic brain injury he suffered in 2012. That injury resulted in some degree of memory loss, causing him to forget events and people. He testified that others have told him that the injury has impacted his ability to reason. And he acknowledged that others have said that the injury could cause violent tendencies. Indeed, he reported during his initial meeting with DSS staff that the injury caused him "uncontrolled anger."

And though father may have had a healthy relationship with his children while they were in foster care until he was incarcerated, he does not address the more limited relationship he had with them prior to their entering foster care. Father and mother separated little more than a year after their daughters were born. While father testified that he paid child support to mother, his testimony also indicates that he had no contact with his children until their guardian *ad litem* found him to tell him about abuse A. had suffered. Though each of his children has special medical or developmental needs, the record indicates that he has not had to address those needs on a daily basis since 2012.

A rational fact finder easily could have determined that a cognitively impaired parent with anger management issues and a heightened propensity for violence was unfit to address the unique special needs of three children with whom he had relatively little interaction over the past four years. While the court did not expressly consider how every factor applied to father, it did consider at least some of those factors in light of evidence in the record. "[B]ecause the circuit court relied on appropriate factors and pointed to . . . evidence supporting its decision, this Court cannot hold that the circuit court's best interests determination was 'plainly wrong' or 'without evidence to support it.'" Welch, 64 Va. App. at 49, 764 S.E.2d at 292 (quoting Martin, 3 Va. App. at 20, 348 S.E.2d at 16).

## III. CONCLUSION

Because DSS's duty to investigate did not require it to contact relatives it could not reasonably be expected to find, we conlude that the department met its obligations under Code § 16.1-283(A). We also find that the circuit court's best interests determination under Code § 16.1-283(C) was neither plainly wrong nor without evidentiary support. We therefore affirm the circuit court's decision terminating father's residual parental rights.

<u>Affirmed.</u>